Timothy A. Scott (SBN 215074)
Email: tscott@mckenziescott.com
Nicolas O. Jimenez (SBN 295057)
Email: njimenez@mckenziescott.com
McKENZIE SCOTT PC
1350 Columbia Street, Suite 600
San Diego, California 92101
Telephone: (619) 794-0451
Facsimile: (619) 202-7461

Matthew J. Lombard (SBN 239910)
Email: mlombard@lombardlaw.net
Law Offices of Matthew J. Lombard
11400 West Olympic Boulevard, Suite 1500
Los Angeles, California 90064
Telephone: (424) 371-5930

Nicolas W. Tomas (SBN 339752)
Email: nwtomas@gmail.com
11400 West Olympic Boulevard, Suite 1500
Los Angeles, California 90064
Telephone: (626) 478-9802

Attorneys for Plaintiffs
LOMBARDO PALACIOS and
CLAUDIA ORTIZ

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOMBARDO PALACIOS and CLAUDIA ORTIZ,<br><br>   Plaintiffs,<br><br>    v.<br><br>CITY OF LOS ANGELES, VICKI BYNUM, CHRISTOPHER GABLE, LARRY CAMERON, *through his successors in interest, Kyle Martin Cameron and Hayley Nicole Mandaro*, THOMAS SMALL, DARIN FLORES, and DOES 1-10, inclusive,<br><br>   Defendants. | Case No.: 2:25-cv-10372<br><br>**COMPLAINT FOR DAMAGES AND OTHER RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Lombardo Palacios ("Mr. Palacios") and Claudia Ortiz ("Ms. Ortiz"), by and through their attorneys, complain against Defendants Vicki Bynum, Christopher Gable, Larry Cameron, *through his successors in interest, Kyle Martin Cameron and Hayley Nicole Mandaro*, Thomas Small, Darin Flores (collectively "Individual Officers"), and the City of Los Angeles, (together "Defendants"), and allege as follows:

## **INTRODUCTION**

1.      This case is not about a bungled investigation that unfortunately led to the wrong result following a criminal jury trial.

2.      Instead, it is about maliciously falsified evidence, coercive and psychologically abusive investigative tactics, and intentionally withheld *Brady* and *Giglio* evidence that caused two innocent individuals—one a mere teenager and the other a pregnant young adult—to lose seventeen and a half years of their lives in prison for a crime they did not commit and of which they have now been declared factually innocent.

3.      On May 30, 2007, 15-year-old Lombardo Palacios and 20-year-old Charlotte Pleytez were wrongfully arrested for the murder of Hector Flores, a crime that neither of them had any involvement in and of which they were completely innocent.

4.      Mr. Palacios was just a teenager living in a modest apartment with his mother, Claudia Ortiz, and his younger sister, Sigry Ortiz.

5.      Ms. Pleytez was a young woman, newly pregnant at the time.

6.      Two years later, on October 6, 2009, Ms. Pleytez and Mr. Palacios were wrongfully convicted at trial.

7.      On January 22, 2010, Mr. Palacios and Ms. Pleytez were each sentenced to 50-years-to-life in state prison.

8.      Ms. Pleytez and Mr. Palacios each spent seventeen-and-a-half years in custody for a crime they did not commit as a direct result of the willful, malicious, and deliberately indifferent conduct of the City of Los Angeles and the Individual Officers named in this lawsuit.

9.      As it stands today, Mr. Palacios has spent more time incarcerated than he has

COMPLAINT FOR DAMAGES AND OTHER RELIEF

1   spent in the free world and Ms. Pleytez has spent nearly half of her life in prison.

2       10.    This was no aberration, either. The City of Los Angeles' policies, practices,

3   and customs encouraged and permitted its officers to frame individuals through fabricated

4   evidence, employ unconstitutionally coercive interrogation tactics, withhold exculpatory

5   evidence, manufacture suggestive eyewitness identifications, refuse to investigate or

6   disclose the existence of other known suspects who were more likely the true culprits, and

7   remain complicit in failing to adequately train or supervise officers.

8       11.    After years of legal battles, Mr. Palacios and Ms. Pleytez were both ultimately

9   exonerated in 2024 and declared factually innocent in 2025.

10      12.    This lawsuit seeks redress for the profound damages suffered by Mr. Palacios

11  and his mother as a result of the unlawful and unconstitutional conduct of Defendants

12                      **<u>JURISDICTION AND VENUE</u>**

13      13.    This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and

14  1343(a)(3)-(4) because Mr. Palacios and Ms. Ortiz assert claims arising under the laws of

15  the United States, including 42 U.S.C. § 1983, and United States Constitution.

16      14.    This Court has supplemental jurisdiction over Mr. Palacios' claims arising

17  under state law pursuant to 28 U.S.C. § 1367(a), because those claims are so related to the

18  federal claims that they form part of the same case or controversy under Article III of the

19  United States Constitution.

20      15.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because the incidents,

21  events, acts, and occurrences giving rise to this action occurred within this judicial district.

22      16.    In accordance with the requirements of the California Tort Claims Act (Cal.

23  Gov. Code §§ 810-996.6, *et seq.*), Mr. Palacios and Ms. Ortiz filed a timely tort claim

24  against the City of Los Angeles and its employees under Cal. Gov. Code § 900.4, on or

25  about April 21, 2025.  Defendant City of Los Angeles responded to Mr. Palacios and Ms.

26  Ortiz's tort claim by mailing a notice of rejection of claim on or about May 9, 2025.

27      17.    Therefore, Mr. Palacios and Ms. Ortiz have complied with all prefiling

28  requirements and this lawsuit has been timely filed in accordance with the California Tort

COMPLAINT FOR DAMAGES AND OTHER RELIEF

1  Claims Act.

2  ## **PARTIES**

3  18.    Plaintiff Lombardo Palacios is now 33-year-old, having spent seventeen-and-

4  a-half years arrested, tried, and imprisoned for a crime he did not commit.  Mr. Palacios

5  lives in the greater Los Angeles area where he is now seeking to rebuild his life.

6  19.    Plaintiff Claudia Ortiz is the mother of Lombardo Palacios, who lost the

7  ability to spend seventeen-and-a-half years of companionship and society with her son,

8  after he was taken from her when he was only fifteen years old after being arrested for a

9  crime he did not commit.  Ms. Ortiz lives in the greater Los Angeles area.

10  20.    Defendant Vicki Bynum was a detective and an employee of the LAPD at all

11  times relevant to this lawsuit.  Defendant Bynum was one of the investigating officers in

12  the homicide of Hector Flores.  Defendant Bynum's acts and omissions included, but were

13  not limited to, the unconstitutional and coercive interrogation of Mr. Palacios, the wrongful

14  arrests of Mr. Palacios and Ms. Pleytez, the fabrication of evidence, the generation of false

15  and suggestive witness identifications, the withholding of exculpatory *Brady* evidence that

16  would have helped exonerate Mr. Palacios and Ms. Pleytez, the manufacturing of

17  unlawfully suggestive eyewitness identifications, and a refusal to investigate and disclose

18  the existence of other known suspects who are more likely the true culprits.

19  21.    Defendant Larry Cameron is deceased.  Defendant Cameron was a police

20  officer and an employee of the LAPD at all times relevant to this lawsuit.  Defendant

21  Cameron was one of the leading police officers responsible for investigating the homicide

22  of Hector Flores.  Defendant Cameron's acts and omissions included, but were not limited

23  to, the unconstitutional and coercive interrogation of Mr. Palacios, the wrongful arrests of

24  Mr. Palacios and Ms. Pleytez, the fabrication of evidence, the generation of false and

25  suggestive witness identifications, the withholding of exculpatory *Brady* evidence that

26  would have helped exonerate Mr. Palacios and Ms. Pleytez, the manufacturing of

27  unlawfully suggestive eyewitness identifications, and a refusal to investigate and disclose

28  the existence of other known suspects who are more likely the true culprits.

22.    Upon information and belief, Kyle Martin Cameron and Hayley Nicole Mandaro are the successors in interest to decedent Larry Cameron.  Upon information and belief, Defendant Cameron is entitled to indemnification under statute and by contract.

23.    Defendant Thomas Small was a detective and an employee of the LAPD at all times relevant to this lawsuit.  Defendant Small was one of the supervising detectives responsible for investigating the murder of Hector Flores.  Defendant Small's acts and omissions included, but were not limited to, the unconstitutional and coercive interrogation of Mr. Palacios, the fabrication of evidence, the generation of false and suggestive witness identifications, the withholding of exculpatory *Brady* evidence that would have helped exonerate Mr. Palacios and Ms. Pleytez, the manufacturing of unlawfully suggestive eyewitness identifications, and a refusal to investigate and disclose the existence of other known suspects who are more likely the true culprits.

24.    Defendant Christopher Gable was a detective and an employee of the LAPD relevant to this lawsuit.  Defendant Gable was one of the investigating officers in the homicide of Hector Flores.  Defendant Gable's acts and omissions included, but were not limited to, the fabrication of evidence, the generation of false and suggestive witness identifications, the withholding of exculpatory *Brady* evidence that would have helped exonerate Mr. Palacios and Ms. Pleytez, the manufacturing of unlawfully suggestive eyewitness identifications, and a refusal to investigate and disclose the existence of other known suspects who are more likely the true culprits.

25.    Defendant Darin Flores was a police officer and an employee of the LAPD relevant to this lawsuit.  Defendant Flores was one of the investigating officers in the homicide of Hector Flores.  Defendant Flores' acts and omissions included, but were not limited to, the fabrication of evidence, the retaliation against Mr. Palacios and Ms. Pleytez for Internal Affairs complaints made against him, the withholding of *Brady* evidence that would have helped exonerate Mr. Palacios and Ms. Pleytez, and a refusal to investigate and disclose the existence of other known suspects who are more likely the true culprits.

26.    At all times relevant to the events described in this lawsuit, currently unknown

defendants sued herein as Does 1 through 20, were officers and supervisors in the Los Angeles Police Department who were responsible for overseeing the investigation of the murder of Hector Flores, and in that capacity, they directed, reviewed, approved, and ratified decisions of the Individual Officers, engaged in investigative activities themselves, had knowledge of the investigative steps taken and evidence generated by the Individual Officers, and also participated in the misconduct alleged in this lawsuit.  Mr. Palacios and Ms. Ortiz are informed and believe that, at all relevant times acting in the course and scope of their employment and agency, each defendant is the agent of the other and was in some manner responsible for the acts and omissions alleged herein, and Mr. Palacios and Ms. Ortiz will ask leave of the Court to amend the complaint to allege such names and responsibility when that information is ascertained.

27.    Defendant City of Los Angeles is and was at all relevant times a duly organized public entity operating pursuant to the general laws of California.  The City of Los Angeles is a chartered subdivision of the State of California with the capacity to be sued.   The City of Los Angeles is responsible for the actions, omissions, policies, procedures, practices, and customs of its various agents and agencies, including the LAPD and its agents and employees.

## **GENERAL ALLEGATIONS**

28.    The individually named police officers referred to collectively as the "Individual Officers" in this complaint, and any currently unknown officers, acted under color of law and within the scope of their employment at all times relevant to this lawsuit. The Individual Officers are sued in their individual capacities.

29.    The Individual Officers acted at all times as agents of the City of Los Angeles. The City of Los Angeles is responsible for indemnifying judgments against the Individual Officers.  In addition, the City of Los Angeles is liable for all torts the Individual Officers committed pursuant to the doctrine of respondeat superior.  The City of Los Angeles is liable for violations of Mr. Palacios and Ms. Ortiz's rights caused by the unconstitutional policies and customs of the Los Angeles Police Department, including actions of the

COMPLAINT FOR DAMAGES AND OTHER RELIEF

Individual Officers undertaken pursuant to those policies and customs during the Hector Flores murder investigation. The currently unknown supervising officers of LAPD, Individual Officers, and others had or had been delegated final policymaking authority for the policies and customs of the Los Angeles Police Department.

30.    Pursuant to California Government Code § 815.2, the City of Los Angeles is vicariously liable to Mr. Palacios and Ms. Ortiz for all of the following causes of action by virtue of the fact that the Individual Officers, acting within the scope of their employment, are liable. Mr. Palacios and Ms. Ortiz suffered the injuries described herein as a direct and proximate result of the Individual Officers' misconduct. During all relevant times, the Individual Officers were employees and agents of the City of Los Angeles and the LAPD, acting within the scope of their employment or agency. Defendant City of Los Angeles is liable as principal for all torts committed by its agents, including the Individual Officers.

31.    Mr. Palacios and Ms. Ortiz make no claim for punitive damages against the City of Los Angeles.

32.    Each named defendant acted—or failed to act—maliciously, callously, oppressively, wantonly, recklessly, and with deliberate indifference to the rights of Mr. Palacios and Ms. Ortiz.

33.    Each paragraph of this complaint is expressly incorporated into each cause of action which is a part of this complaint.

## FACTUAL BACKGROUND

34.    As a direct consequence of the intentional misconduct of officers within the Los Angeles Police Department, Mr. Palacios, and his eventual co-defendant, Charlotte Pleytez, were both wrongfully arrested, and ultimately, wrongfully convicted of a murder that neither of them committed nor with which they had any involvement.

35.    Mr. Palacios and Ms. Pleytez each spent seventeen-and-a-half years wrongfully incarcerated as a result of the willful and malicious conduct of the LAPD and its officers, including but not limited to, the conduct of Detective Vicki Bynum, Detective Christopher Gable, Detective Larry Cameron, Detective Thomas Small, Detective Darin

Flores, and other LAPD officers who each violated the rights of Mr. Palacios and Ms. Pleytez while acting pursuant to the City of Los Angeles' policies and practices.

**The Murder of Hector Flores**

36.    Hector Flores was murdered on March 28, 2007 when he and his fiancée, Lenette Benkiran ("Benkiran"), drove a burgundy-colored 2006 Nissan Murano to the area of Sunset Boulevard and Hobart Avenue in Hollywood sometime between 9:30 p.m. and 10:00 p.m. for the purpose of selling a small quantity of crack cocaine to a local transient known by the nickname, "Sinbad."

37.    Benkiran's trial testimony about her own drug use as well as the events leading up to the murder was rife with inconsistencies.

38.    Benkiran testified that their stash of crack cocaine was for personal use and that they only sold Sinbad $7 or $8 worth.

39.    However, Benkiran also testified that she and Flores sold crack cocaine to Sinbad for the purpose of securing money to get a hotel room that night.

40.    At trial, Benkiran testified that she struggled with drug addiction and had been using crack cocaine for approximately two weeks prior to the murder of Flores.

41.    In addition, Benkiran testified that she was using approximately $30 to $40 of crack cocaine per day leading up to the murder.

42.    Meanwhile, Benkiran testified that prior to the alleged two-week bender, she had been sober for three years.

43.    However, on July 3, 2006, approximately nine months before the murder, Benkiran was arrested for being under the influence of crack cocaine and pled guilty to the crime on September 12, 2006.

44.    After exchanging the rock cocaine with Sinbad, Benkiran stated she went across the street to allegedly purchase some Chinese food at Chinatown Express for another transient individual, Joseph Lee Henry, who went by the nickname, "Liquor Store Joe."

45.    However, when police later interviewed the China Express employees, they stated that they knew Benkiran and she did not purchase food that night.

COMPLAINT FOR DAMAGES AND OTHER RELIEF

46.    According to Benkiran, the interaction with Henry lasted a matter of moments and not more than fifteen minutes passed from the time Sinbad left their vehicle to the time that they met Henry.

47.    After meeting with Henry, Flores then drove into the 99 Cents Store parking lot located on Sunset Boulevard.

48.    While inside the parking lot, Benkiran and Flores noticed a white vehicle with yellow tape toward the rear passenger side in the parking lot.

49.    The white vehicle was driven by a female driver and contained two male occupants.

50.    Flores engaged in a dialogue about gang membership with one of the male passengers, who claimed affiliation with the White Fence street gang, wherein Flores stated that he was formerly a member of the Latin Kings street gang.

51.    Flores began driving away when one of the white car's male occupants exited the vehicle and walked over to Flores' car and shot multiple times into the car.

52.    Both Flores and Benkiran were hit by the gunfire.

53.    Benkiran sustained a gunshot wound to her right shoulder and collarbone.

54.    Benkiran survived and observed a motionless and deceased Flores in the driver's seat.

55.    Flores had slumped over the steering wheel and his car continued to move forward until it hit another parked vehicle on Sunset Boulevard.

56.    Flores was later pronounced dead.

57.    At trial, Benkiran testified that she was unable to see anyone exit the white vehicle and did not observe anyone running alongside the vehicle.

58.    Benkiran also testified that the shooting happened in an "instant" and Benkiran was only able to observe the gunman for a "few seconds" while she was "ducking down" in the vehicle after Flores told her to, "Get down!"

59.    Benkiran was nearsighted and relied on trifocal lenses to correct her vision.

60.    Despite these shortcomings, Benkiran testified that she was 100% certain that

9

1    Mr. Palacios was the gunman and Ms. Pleytez was the driver.

2        61.    A pipe used to smoke crack cocaine was found in Flores' vehicle on the night

3    of the murder.

4        62.    Still, Benkiran maintained that she did not use any crack cocaine that entire

5    day.

6        63.    Benkiran told detectives that Henry gave her the crack pipe, but when police

7    interviewed Henry, he denied that he gave Benkiran a crack pipe.

8    **The Coercion of Eyewitnesses Elizabeth Enciso and Janet Yi and the**

9    **Withholding of Exculpatory Evidence**

10        64.    Two eyewitnesses, Elizabeth Enciso and Janet Yi, witnessed the aftermath of

11    the shooting.

12        65.    Enciso and Yi were friends and attended cosmetology school together.

13        66.    On the night of the shooting, Enciso and Yi drove together in Enciso's black

14    Ford Explorer, and ultimately parked at the 99 Cents Store parking lot before walking

15    across the street to an Asian restaurant to have dinner.

16        67.    After dinner with a group of friends, the two returned to the parking lot, where

17    they planned on visiting a nightclub located in the plaza.

18        68.    When they returned to Enciso's vehicle at approximately 10:00 p.m., Enciso

19    got into the backseat of the vehicle so that she could change her clothes.

20        69.    Meanwhile, Yi stood outside of the vehicle.

21        70.    While Enciso was changing her clothes, Enciso heard the gunshots, initially

22    believing them to be fireworks.

23        71.    Enciso then pulled Yi inside of her Ford Explorer.

24        72.    Enciso looked outside of the vehicle and witnessed the shooter approximately

25    15 feet away walking by at a slow pace.

26        73.    Yi estimated the shooter to be approximately 16 to 17 feet away.

27        74.    Enciso and Yi both witnessed a silver-colored gun in his right hand toward

28    his side.

75.    Immediately after the shooting, Enciso witnessed the shooter get back into the white vehicle on the passenger side.

76.    The female driver allegedly turned her head around towards the shooter.

77.    After the shooting, the white vehicle exited the parking lot.

78.    Yi described the vehicle as a smaller white Nissan model.

79.    Enciso and Yi eventually met with detectives following the crime to identify potential suspects.

80.    Enciso and Yi were shown a gang booklet, which contained a binder of pictures of alleged White Fence gang members.

81.    Problematically, Enciso was instructed to simply start circling different individuals who may have "*looked like*" the suspects.

82.    Defendants Bynum and Gable directed Enciso to simply "*pick out whoever you think looks like them*" and "*circle the ones who come to mind*" after Enciso told the Individual Officers, "*I don't remember.*"

83.    In post-conviction interviews, Enciso revealed that she had circled many photographs of possible individuals in the gang booklet and from photo arrays presented by Defendants Bynum and Gable, including four or five males and multiple photographs of females.

84.    On one of the pages that Enciso was shown, Enciso picked out a single individual, while on other pages, she circled multiple individuals.

85.    Defendant Gable met with Enciso on two occasions—once at her workplace and once at the courthouse.

86.    Both times, Defendant Gable pressured Enciso to select Mr. Palacios and Ms. Pleytez.

87.    In post-conviction interviews, Enciso revealed that Mr. Palacios and Ms. Pleytez's conviction had been "haunting" her for many years.

88.    Enciso knew that the LAPD and the Individual Officers, including Defendants Bynum and Gable pressured her and Yi to select Mr. Palacios and Ms. Pleytez.

11

89.     Enciso knew it was wrong for the LAPD and the Individual Officers to coerce and pressure her into picking Mr. Palacios and Ms. Pleytez and to insist that they had the "right" suspects.

90.     Indeed, the Individual Officers rejected, hid, and suppressed the fact that Enciso had identified other individuals from photo arrays and the gang booklet.

91.     In addition, the Individual Officers authored false police reports that misrepresented the statements of Enciso and Yi in order to create false evidence against Mr. Palacios and Ms. Pleytez and to hide evidence of alternate suspects.

92.     Defendants Bynum and Gable then falsified police reports by falsely claiming that Enciso had *only* selected Mr. Palacios and Ms. Pleytez's photographs and withheld the fact that Enciso and Yi had both selected and identified other individuals in the photo arrays and gang booklet.

93.     During the trial, Defendants Bynum and Gable *only* showed Enciso photographs of Mr. Palacios and Ms. Pleytez before she was called to testify, even though she had circled multiple photos of other individuals.

94.     In addition, prior to Enciso's testimony, Defendants Gable and Bynum fed Enciso false information that the murder was a "*gang initiation*" and that in order to get into the gang, Mr. Palacios had to commit the murder.

95.     Defendants Gable and Bynum also attempted to instill fear into Enciso by claiming that Mr. Palacios and Ms. Pleytez were gang members and warned her not to discuss the case with anyone.

96.     Prior to her testimony, Enciso asked Defendants Bynum and Gable: "*Where are the other photos I picked?*"

97.     Enciso wondered why Defendants Bynum and Gable only showed her photographs of Mr. Palacios and Ms. Pleytez and knew intuitively it was wrong for the Individual Officers to fabricate these identifications since she had identified four or five other potential individuals as resembling the suspected shooter and suspected driver.

98.     During her testimony, Enciso was visibly frustrated and appeared angry

COMPLAINT FOR DAMAGES AND OTHER RELIEF

because she knew that she had selected other photographs yet was only presented Mr. Palacios and Ms. Pleytez's photographs at trial.

99.   However, Defendants Bynum and Gable falsely reassured Enciso they had a "mountain" of evidence against Mr. Palacios and Ms. Pleytez, that there were many other witnesses, and that Mr. Palacios and Ms. Pleytez were the "right" suspects responsible for the murder of Hector Flores.

100.   Enciso felt as though the officers were tricking her into falsely identifying Mr. Palacios as the shooter and Ms. Pleytez as the driver.

101.   When Enciso questioned Defendants Bynum and Gable as to whether she and Yi were the only civilian witnesses testifying, Defendants Bynum and Gable lied to Enciso and falsely claimed that there were other testifying civilian witnesses.

102.   The LAPD and the Individual Officers willfully withheld exculpatory evidence of the other identifications both in official reports and in their testimony, which would have shown that Enciso and Yi had identified several other suspects in the gang booklet as potentially resembling the shooter and driver.

103.   Enciso repeatedly told Defendants Bynum and Gable that she was not sure of her identifications—but Defendants Bynum and Gable intentionally and maliciously falsified police reports and evidence claiming that Enciso had positively identified only Mr. Palacios and Ms. Pleytez.

104.   Meanwhile, in the course of the purported investigation, Defendants Bynum and Gable repeatedly told Enciso and Yi that they knew who committed the murder and that they had the "right" suspects, referring to Mr. Palacios and Ms. Pleytez.

105.   The Individual Officers also demanded that Enciso and Yi not speak to each other about the crime or the investigation.

106.   All through the purported investigation, the Individual Officers engaged in unlawfully suggestive tactics to pressure Enciso and Yi to identify Mr. Palacios and Ms. Pleytez, by insisting that they had the "right" people and falsely reassuring Enciso and Yi that Mr. Palacios and Ms. Pleytez were the ones who committed the murder of Flores.

107.   This conduct by the Individual Officers continued into the trial, wherein the Individual Officers guarded Enciso and Yi and persisted in pressuring them to falsely testify that Mr. Palacios and Ms. Pleytez were the perpetrators of the crime, while demanding that Enciso and Yi not speak to each other about the crime.

108.   At one point during the trial, Enciso attempted to talk to Ms. Pleytez's mother, Carla Campos, and tried to give Ms. Campos her phone number so that she could tell Ms. Campos about how detectives illegally pressured her to falsely identify Ms. Pleytez and Mr. Palacios.

109.   When Enciso began to provide Ms. Campos with her telephone number, Enciso was quickly interrupted by one of the Individual Officers who directed her not to talk to Ms. Campos and separated Enciso from Ms. Campos.

110.   Both at the preliminary hearing and at trial, Enciso testified that she was "*unsure*" whether Ms. Pleytez was the driver and could not positively identify Ms. Pleytez in court.

111.   Enciso ultimately testified at trial that she could not confidently identify anyone because too much time has passed.

112.   At the preliminary hearing, Yi ultimately stated she was only 60% sure that Ms. Pleytez was the female driver.

113.   Unsatisfied with Yi's equivocal identification, the Individual Officers pressured Yi to positively identify Ms. Pleytez in court as the driver at trial.

114.   At trial, Yi positively identified Ms. Pleytez as the driver, but then backtracked and stated she was only 60% sure that Ms. Pleytez was the female driver.

### The Coercion of Eyewitness Lenette Benkiran and the
### Use of Unlawfully and Highly Suggestive Identification Procedures

115.   Meanwhile, Defendants Bynum and Gable employed unlawfully suggestive identification techniques when prompting Benkiran to identify suspects.

116.   On April 11, 2007, Benkiran was first shown an 11-page gang booklet containing six photos on each page of individuals believed to be White Fence gang

14

members from the Hollywood area.

117.    A picture of Mr. Palacios was included in the gang booklet.

118.    Despite being shown a picture of Mr. Palacios, Benkiran stated she could not identify him as the shooter.

119.    Unsatisfied with Benkiran's failure to identify Mr. Palacios, Defendants Bynum and Gable insisted on showing Mr. Palacios' picture a second time—this time using a standalone 1-page picture of Mr. Palacios on April 27, 2007—nearly a month after the murder took place.

120.    Defendants Bynum and Gable knew that it was improper and impermissibly suggestive to attempt to obtain an identification of a suspect via a standalone photograph, but they did it anyway.

121.    Indeed, Defendants Bynum and Gable knew that it was a violation of Mr. Palacios and Ms. Pleytez's Due Process rights to employ impermissibly suggestive identification techniques, particularly those involving a single photograph, as clearly established since at least 1967. *See, e.g., Stovall v. Denno*, 388 U.S. 293 (1967); *Simmons v. United States*, 390 U.S. 377 (1968); *Neil v. Biggers*, 409 U.S. 188 (1972).

122.    It was only after Defendants Bynum and Gable engaged in unlawfully suggestive identification techniques, including the use of a standalone photograph of Mr. Palacios, that Benkiran eventually identified Mr. Palacios.

123.    Even more troubling, the first seven pages of the gang booklet contained only males and the eighth page contained a picture of Ms. Pleytez.

124.    Ms. Pleytez's picture was surrounded by photographs of five male individuals.

125.    Ms. Pleytez was one of only two females in the entire gang booklet, and the only female depicted on that page with five male photographs.

126.    Benkrian was not shown any other photographs of potential female suspects.

127.    Presented with this impermissibly suggestive photo arrangement by Defendants Bynum and Gable, Benkiran identified Ms. Pleytez—the first and only female

she was presented with and only female on the page—as allegedly matching the description of the driver.

128.  The photo array of Ms. Pleytez surrounded by five other male individuals was unconstitutionally improper and unduly suggestive.

129.  Indeed, the photo array of Ms. Pleytez surrounded by five male individuals was plainly conducive to misidentification since it draws focus on only a single individual—Ms. Pleytez.

130.  After identifying Ms. Pleytez as the driver, Defendants Bynum and Gable refused to show Benkiran any additional photographs of potential female suspects.

131.  In presenting photo arrangements to Benkiran, Enciso, and Yi, Defendants Bynum and Gable ignored discrepancies between potential suspects and the witness descriptions of the shooter and driver.

132.  The photo arrangements presented to Benkiran, Enciso and Yi were patently unfair, biased, and unlawfully suggestive.

133.  Mr. Palacios' photograph was shown to Benkiran not once—but twice.

134.  The first time Benkiran was shown Mr. Palacios' photograph, Benkiran stated that she could not identify him as the shooter.

135.  Unsatisfied with Benkiran's failure to identify Mr. Palacios, Defendants Bynum and Gable chose to show Benkiran a full-size photograph of Mr. Palacios, and by doing so, directed her to select only Mr. Palacios' photograph.

136.  By showing Mr. Palacios' photograph twice and directing Benkiran, Enciso, and Yi to a full-size photograph of Mr. Palacios, Defendants Bynum and Gable contaminated the identification procedure by suggestively directing their attention only to Mr. Palacios—and no other possible suspects.

137.  It was contrary to established policing practices, and gratuitously suggestive, to show Benkiran a second photograph of Mr. Palacios after she did not select him in the photo arrangement in the gang booklet in the first instance.

138.  Established police practices at the time recognized the importance of giving

COMPLAINT FOR DAMAGES AND OTHER RELIEF

witnesses specific cautionary instructions before administering an identification procedure.

139.   Defendants Bynum and Gable did not provide such admonishments to Benkiran, Enciso, and Yi.

140.   The LAPD chose to allow the Individual Officers to improperly influence eyewitnesses, including feeding information and using suggestive identification procedures to skew their identifications, so that the witnesses would identify their preferred suspects—Mr. Palacios and Ms. Pleytez.

141.   The LAPD also chose to allow the Individual Officers to conduct unreliable and unduly suggestive eyewitness identification procedures because they valued securing Mr. Palacios and Ms. Pleytez's convictions more than respecting their constitutional rights.

142.   The LAPD and the Individual Officers willfully and maliciously failed to report that Enciso and Yi had identified other suspects, refused to provide appropriate admonishments, and inconsistently asked witnesses to sign only photographs that included Mr. Palacios and Ms. Pleytez in an attempt to manipulate the identification procedure and wrongfully secure the convictions of Mr. Palacios and Ms. Pleytez.

### The Financial Benefits to Benkiran Hidden from the Defense in Violation of *Brady* and *Giglio*

143.   During the investigation following the murder, detectives, including Defendant Vicki Bynum, developed a close relationship with Benkiran.

144.   Benkiran, who was homeless and struggled with drug addiction, was provided significant financial incentives for her testimony, including monetary benefits and housing in connection with the murder case.

145.   Detective Bynum remains in communication with Benkiran to this day.

146.   The financial benefits, housing, and other incentives that Benkiran received were unlawfully withheld from the defense at trial in violation of *Brady* and *Giglio* and constitutional protocols.

147.   Revealing any financial benefits that Benkiran received would have been exculpatory impeachment evidence favorable to Ms. Pleytez and Mr. Palacios and material

1    to their defense.

2    148.    These financial benefits served as a significant incentive to Benkiran to stay

3    in the good graces of LAPD, given that she was homeless and suffering from drug

4    addiction.

5    149.    The Individual Officers willfully and maliciously withheld this exculpatory

6    impeachment evidence in violation of Mr. Palacios and Ms. Pleytez's constitutional rights

7    under the Due Process Clause and Fourteenth Amendment.

8    **The LAPD and the Individual Officers Knew Who Actually Committed**

9    **the Murder Yet Continued to Frame Mr. Palacios and Ms. Pleytez**

10    150.    Incredibly, at the time of Mr. Palacios and Ms. Pleytez's arrests, LAPD

11    detectives already knew who committed the murder, but persisted in framing Mr. Palacios

12    and Ms. Pleytez—two individuals who barely even knew one another.

13    151.    Indeed, on April 17, 2007—less than three weeks after the murder—LAPD

14    detectives received credible information that two White Fence gang members, with the

15    initials of B.R. and R.N.[1], had committed the murder.

16    152.    LAPD Detective Carlos Lopez had interviewed a confidential source who

17    stated that "*B.R. was with the shooter 'Barron'*" and that R.N., who went by the moniker,

18    "*Barron*," was the shooter.

19    153.    The source further provided credible and detailed information by describing

20    the gun as being a stainless steel 9mm handgun that was still "*in the hood*."

21    154.    The source also stated that the individuals involved knew that the "*girl*

22    *survived*."

23    155.    Detective Lopez provided this information to Detective Bynum.    The

24    detective notes written by Detective Vicki Bynum further indicated that, "*Officer Heim's*

25    *killer is the uncle of the shooter.*"

26    156.    This is significant, because R.N.'s uncle was, in fact, the alleged killer of

27

28    ─────────────────

[1] These individuals will be referred to by their initials to protect their identity and so as to not compromise any investigations into the murder.

18

COMPLAINT FOR DAMAGES AND OTHER RELIEF

Officer Heim, which further cements the fact that the Individual Officers knew of the true identity of the actual perpetrators of the murder.

157. Instead of investigating these critical leads, the Individual Officers insisted on framing Mr. Palacios and Ms. Pleytez who were completely innocent and had absolutely no involvement in the murder.

158. Rather than investigating these suspects after Benkiran could not identify Mr. Palacios in the first photo arrangement, the Individual Officers went all in on manufacturing a case to convict Mr. Palacios despite facts learned in the investigation showing he was not actually involved in the shooting.

159. For example, rather than compiling photo arrays which included B.R. or R.N., Defendants Bynum and Gable chose instead to show witnesses a standalone picture of Mr. Palacios—even after Benkiran failed to identify Mr. Palacios after being shown a gang booklet that included his photo.

160. In connection with post-conviction proceedings, B.R. has since provided a detailed interview with the Los Angeles District Attorney's Office and has admitted to being one of the three occupants in the vehicle who participated in the murder.

161. B.R. also admitted that R.N. was the shooter.

162. B.R. confirmed that Mr. Palacios and Ms. Pleytez had nothing to do with the crime.

163. B.R. is currently in prison, serving time for an unrelated murder that he and R.N. committed together in August of 2007, just five months after Flores was killed.

164. The unrelated murder that B.R. and R.N. were convicted of was also investigated by detectives from LAPD and prosecuted by the exact same prosecutor in Mr. Palacios and Ms. Pleytez's case, Dayan Mathai.

165. There is no question that LAPD detectives knew the identities of B.R. and R.N and were actively investigating the two.

166. In fact, it was revealed in testimony and police interviews in connection with B.R. and R.N.'s murder prosecution that B.R. had been involved in previous shootings.

COMPLAINT FOR DAMAGES AND OTHER RELIEF

167.   These facts demonstrate that LAPD detectives knew that their unlawful misconduct resulted in prosecuting two innocent individuals but continued to pursue Ms. Mr. Palacios and Ms. Pleytez anyway without a shred of evidence suggesting either of them were involved in the murder.

168.   Meanwhile, the true perpetrators ended up committing a second murder that may have been prevented by a fair and lawful investigation in the first instance.

169.   The female driver of the white vehicle, E.L.[2] also provided a detailed interview with the Los Angeles District Attorney's Office in connection with post-conviction proceedings, pursuant to a grant of immunity, and corroborated these same facts.

170.   Indeed, E.L. confirmed that she, B.R. and R.N. all occupied the white vehicle on the night of the shooting and that R.N. was the actual shooter.

171.   E.L. confirmed that Mr. Palacios and Ms. Pleytez had absolutely nothing to do with the murder.

172.   E.L. described the events as a "dark cloud" that has been hanging over her for years, though she acknowledged that her emotional pain was nowhere near as bad as the pain suffered by Mr. Palacios and Ms. Pleytez.

173.   Despite evidence that B.R. and R.N. were responsible for the murder of Hector Flores, the Individual Officers nevertheless began to pursue Mr. Palacios and Ms. Pleytez without any probable cause to believe that either Mr. Palacios or Ms. Pleytez were involved in the murder in any way.

174.   In doing so, LAPD and the Individual Officers violated Ms. Pleytez and Mr. Palacios' constitutional rights, including under 42 U.S. Code § 1983.

175.   Ultimately, the LAPD and the Individual Officers engaged in unlawful practices to frame Mr. Palacios and Ms. Pleytez, including by intentionally withholding exculpatory evidence, refusing to investigate the actual perpetrators, fabricating evidence,

---

[2] This individual will also be referred to by her initials to protect her identity and so as to not compromise any investigations into the murder.

COMPLAINT FOR DAMAGES AND OTHER RELIEF

engaging in unlawfully suggestive identification practices, and pressuring witnesses to provide false testimony all in an attempt to secure the wrongful conviction of Mr. Palacios and Ms. Pleytez—who had absolutely no involvement in the murder and barely even knew each other.

### The Unlawful Arrests of Mr. Palacios and Ms. Pleytez

176.    At approximately 5:15 a.m. on May 30, 2007, LAPD detectives together with a SWAT team executed a search warrant and arrested Mr. Palacios at the Hollywood apartment where Mr. Palacios lived with his mother, Claudia Ortiz, and his then 9-year-old sister, Sigry Ortiz.

177.    After arresting Mr. Palacios, Sigry observed Detective Bynum high-five another detective.

178.    At approximately 5:45 a.m. that same day, LAPD detectives together with a SWAT team executed a second search warrant at Ms. Pleytez's residence and arrested Ms. Pleytez at the Van Nuys apartment where Ms. Pleytez resided with her family.

179.    Both apartments were raided and torn apart by LAPD SWAT team officers searching for any link to the murder.

180.    But no evidence was found linking either Mr. Palacios and Ms. Pleytez to the murder, or even suggesting that Mr. Palacios and Ms. Pleytez s knew each other.

181.    To secure the false arrests of Mr. Palacios and Ms. Pleytez, the Individual Officers willfully and maliciously wrote reports during their investigation, which included false statements and material omissions, making them misleading, and excluding favorable and exculpatory information of their innocence.

182.    The search and arrest warrants obtained by the Individual Officers were "*Ramey*" warrants, where law enforcement presents the warrant application and supporting documents directly to a judge and obtains a warrant.  The District Attorney's Office is not directly involved, and, if there is ultimately a criminal charge filed against the subject of the warrant, that case receives a different California Superior Court number, and the warrant and related materials are not contained in the later filed criminal case court file.

COMPLAINT FOR DAMAGES AND OTHER RELIEF

183.    The *Ramey* search and arrest warrants were used by LAPD detectives to intentionally mislead the Court into believing that Enciso and Yi had identified and selected *only* Mr. Palacios and Ms. Pleytez during their identification sessions, and withheld any information about the impermissibly suggestive measures used.

184.    These material omissions were intentional and done for the sole purpose of misleading the judicial officer into authorizing search and arrest warrants for Mr. Palacios and Ms. Pleytez.

**The Unconstitutionally Coercive Interrogation Tactics Used to Silence Fifteen-Year-Old Mr. Palacios' Pleas of "*I'm innocent. I'm innocent.*"**

185.    Mr. Palacios, who was fifteen years old at the time, was interrogated in a separate room by Defendants Bynum, Small, and Cameron.

186.    Defendants Bynum, Small, and Cameron used unconstitutional tactics to try and coerce, Mr. Palacios into implicating himself and Ms. Pleytez for a crime that neither of them committed nor had any involvement with.

187.    Mr. Palacios' videotaped interrogation reveals LAPD detectives who—with guns on their hips and Mr. Palacios handcuffed to a chair—used unconstitutional and psychologically coercive tactics in an effort to elicit false, forced, and fabricated statements from Mr. Palacios.

188.    The grueling interrogation was captured on video showing that Defendants Bynum, Cameron, and Small repeatedly violated Mr. Palacios' constitutional rights.

189.    The video of Mr. Palacios' interrogation provides context and information that goes beyond the cold transcript of the complaint, revealing coercive and psychologically abusive tactics.

190.    The interrogation was guilt-presumptive, accusatory, and menacing, as Defendants Bynum, Cameron, and Small lied to, threatened, cajoled, and berated Mr. Palacios again and again and again.

191.    Defendants Bynum, Cameron, and Small's actions toward a fifteen-year-old remained argumentative, manipulative, coercive, threatening, and intimidating.

192.  Defendants Bynum, Cameron, and Small used their size and position to intimidate and threaten Mr. Palacios by towering over him and speaking over him.

193.  LAPD detectives falsely informed Mr. Palacios that "*everybody pointed him out*" and that the whole gang told the police that he committed the shooting.

194.  Mr. Palacios had neither the assistance of an attorney or a parent/guardian during the interrogation.

195.  Mr. Palacios can be seen crying and repeating—truthfully—nearly 200 times that he is innocent, in one form or another.

196.  The Individuals made false promises, screamed and yelled, lied, and refused to accept Mr. Palacios' repeated and truthful claims that he was innocent.

197.  The tactics employed by three seasoned officers against a fifteen-year-old were unconstitutional, psychologically abusive, and not aimed at searching for the truth in any way whatsoever.

198.  Defendants Bynum, Cameron, and Small made false promises, screamed, yelled, lied, and refused to listen to Mr. Palacios who repeatedly stated that, "*I'm innocent*," "*I wasn't even there*," "*I didn't do nothing*," ad infinitum.

199.  During the interrogation of Mr. Palacios, three different seasoned LAPD detectives, Detectives Bynum, Cameron, and Small all threatened and coerced Mr. Palacios and insisted that he admit to a murder that he did not commit.

200.  Detectives told Mr. Palacios that they knew he had been, "*running around*," with Charlotte, to which Mr. Palacios retorted, "*Who's Charlotte?*"

201.  Mr. Palacios had only seen Ms. Pleytez once before in passing.

202.  Detective Bynum told Mr. Palacios, "*I already know what you did*," and insisted that he "*got out of the car and walked up and shot those people*."

203.  At that point, Detective Cameron interjected, "*We already know you did it, so let's get past saying you didn't have anything to do with it*."

204.  This cycle of intimidating, threatening, and demanding that Mr. Palacios admit to the murder and implicate Ms. Pleytez in the murder repeated over and over.

23

205.    In response to each accusation, Mr. Palacios stated over and over again, "*I'm innocent. I'm innocent.*"

206.    Defendants Bynum, Cameron, and Small intentionally fed Mr. Palacios details of the crime he would not otherwise have known in order to secure a false confession.

207.    Through tears, Mr. Palacios continued to deny involvement.

208.    After an hour of accusations followed by denials, Defendants Bynum and Cameron left the interview room in order to make him feel desperate and isolated.

209.    While Mr. Palacios was sitting alone in the interrogation room, he cried and pleaded for God's help and professed that he "*did nothing.*"

210.    Mr. Palacios kept repeating to himself, "*I didn't do nothing*" and "*I'm innocent*" over and over again.

211.    When Defendant Bynum returned with Defendant Small, a back-and-forth between Mr. Palacios and the LAPD detectives ensued throughout the interrogation, where Mr. Palacios repeatedly stated, "*I wasn't there*" and detectives stated, "*You were there.*"

212.    Throughout the interrogation, Mr. Palacios continued to repeat, "*I am innocent,*" while detectives retorted to Mr. Palacios, "*You're not innocent… We already know you're not innocent so let's don't even go there,*" while lying to him by telling him "*everybody*" said he did it.

213.    In a dizzying fashion, this cyclical loop of back-and-forth questioning continued.

214.    Among other things, in the interrogation, Mr. Palacios also told detectives, "*innocent people go to jail,*" and "*innocent people fear nothing.*"

215.    Ultimately, the unconstitutional and psychologically coercive interrogation tactics used by Defendants Bynum, Cameron and Small succeeded in eliciting false statements by Mr. Palacios, who after repeatedly denying any involvement in the crime and proclaiming his innocence, finally provided false statements to the detectives and attempted to place himself at the scene by answering a series of leading questions.

216. Defendants Bynum, Small, and Cameron ultimately succeeded in bullying Mr. Palacios into falsely implicating Ms. Pleytez in the murder as well

217. As Mr. Palacios began to talk, Detective Bynum began to pat Mr. Palacios on the arm and tell him he was "*doing good*." Mr. Palacios said when he saw what was going to happen, he "*took off*," and suggested that others were blaming him because he took off.

218. In essence, when Mr. Palacios answered accusatory questions, Defendants Bynum, Cameron and Small took steps to indicate that they would only accept certain answers (the ones they wanted).

219. As Mr. Palacios spoke, and was asked about certain details of the crime, he paused for a long time and answered uncertainly.

220. For example, when he was asked what time it was when the shooting occurred, he answered, "*It was kind of late*," contrary to his previous statement where he recalled that it occurred, "*in the morning*."

221. When he was asked if it was dark again, Mr. Palacios paused again and could not really respond to the question.

222. When Mr. Palacios was asked where the victims were, he responded that they were "*walking*"—even though both victims were sitting in a car.

223. When Mr. Palacios gave answers they approved, the detectives would say things like he's "*doing good*," or words to that effect.

224. By contrast, when Mr. Palacios would give the detectives genuine and truthful answers they did not like, they would resist, challenge, interrupt or even threaten him.

225. These tactics were unlawfully coercive and psychologically abusive.

226. The very reason for providing these forms of pressure was to attempt to overbear Mr. Palacios' will and violate his constitutional rights.

227. Defendants Bynum, Cameron and Small each played an instrumental part in the coordination of Mr. Palacios' interrogation and would enter the rooms with guns on their side as Mr. Palacios was chained in order to a chair to exert additional pressure on him.

228.    After engaging in unconstitutional interrogation tactics and obtaining false statements from Mr. Palacios after pressuring him to incriminate himself, Defendants Bynum, Cameron and Small labeled these statements as purported "confessions"—even though many of these statements did not objectively match the crime.

229.    The statements were obviously false and can hardly be labeled as a "confession."   Other than facts supplied by Defendants Bynum, Cameron and Small, Mr. Palacios was unable to make up a story that was consistent with the actual shooting.

230.    For example, witnesses described the involved vehicle as white, the gun as silver, and stated that the crime happened at nighttime.

231.    Meanwhile, Mr. Palacios described the vehicle as "*khaki*," the gun as black, and stated that the crime happened in the daylight.

232.    When asked what the victims looked like, Mr. Palacios could only give limited details about the male, to which Defendant Bynum told him he was being honest, but only partially and that he needed to be completely honest.

233.    Defendant Bynum suggested to Mr. Palacios that he was ordered to take the gun and run up on the people and shoot them, to which Mr. Palacios responded, "*I didn't even pull the trigger*," to which Detective Bynum retorted, "*Maybe you didn't even realize you pulled the trigger.*"

234.    In addition, Mr. Palacios said, "*I didn't hit anyone*" and Defendant Bynum said, "*I know you didn't mean to shoot anyone.*"

235.    Mr. Palacios said he fired twice, to which Defendant Small again responded, "*Are you sure? Maybe you lost count.*"

236.    In addition, these statements were made only after Mr. Palacios was lied to by detectives and told, "*You're not innocent*," "*You were there*," over and over again.

237.    In fact, even after the purported "confession," when left alone in the interview room, Mr. Palacios repeated aloud, "*I didn't do nothing*" over and over again.

238.    Nearly 100 pages of the interrogation transcripts reveal that Mr. Palacios denied any involvement in the crime and proclaimed his innocence repeatedly.

26

239.    Still, Defendants Bynum, Cameron and Small repeatedly lied to Mr. Palacios by falsely telling him that "*everybody*" said he committed the shooting and that they had video of him committing the shooting.

240.    Indeed, Defendant Bynum lied to Mr. Palacios repeatedly throughout the interrogation, even claiming that "*The LAPD doesn't bring out their SWAT team to go to somebody's house unless, first of all, we think that we're going to somebody's house that did something really bad… And we know you did something.*"

241.    The reality was that the entire LAPD SWAT team did, in fact, ransack the home of Mr. Palacios and his family without a shred of evidence that Mr. Palacios had any involvement in the murder of Hector Flores.

242.    Despite that fact the Mr. Palacios repeatedly and truthfully professed his innocence, Defendant Bynum persisted in trying to elicit a false confession from Mr. Palacios by falsely claiming that, "*We have witnesses…we've got video*" and "*I already know what you did*" and telling Mr. Palacios, "*they're all saying it was you.*"

243.    Similarly, Defendants Bynum, Cameron and Small falsely told Mr. Palacios, "*We know you did. The judge seen the evidence and agrees with it.*"

244.    Defendants Bynum, Cameron and Small also falsely claimed that "*Your friends are here… and they're all putting it on you… See we already know you did it*" and told him, "*you got friends in the other room… they're all saying it was you.*"

245.    In addition, Defendant Bynum repeatedly belittled and demeaned fifteen-year-old Mr. Palacios by telling him: "*And you can sit here and tell me, it wasn't me. Wah, wah, wah, wah. Well, it was you.*"

246.    Defendant Bynum's demeaning comments persisted throughout the interview by telling Mr. Palacios, "*You're 15 years old. You don't work. You don't go to school. Your mother doesn't have a pot to piss in.*"

247.    Defendants Bynum, Cameron and Small would not accept Mr. Palacios' truthful and repeated claims professing his innocence and instead Defendant Bynum told him, "*You want to sit here and tell me it wasn't you? I'm not that stupid.*"

248. Defendant Bynum also told Mr. Palacios that if he falsely confessed and implicated Ms. Pleytez, Defendant Bynum "*can at least go to the district attorney and say… he's not a hardcore killer like a lot of the other gangsters are.*"

249. The promises of leniency persisted throughout Mr. Palacios' interrogation wherein Defendant Bynum told Mr. Palacios that if he falsely confesses, she "*can at least go to the district attorney and say… he's not a hardcore killer like a lot of the other gangsters are.*"

250. Defendants Bynum, Cameron and Small further violated Mr. Palacios' constitutional right to be silent as well as *Miranda* by suggesting that Mr. Palacios was *required* to answer the questions.

251. Defendants Bynum, Cameron and Small took no steps to ensure that the *Miranda* admonishments were actually understood by the fifteen-year-old child handcuffed and sitting in front of them.

252. For example, Defendants Bynum, Cameron and Small never asked Mr. Palacios whether he wished to waive his *Miranda* rights, or to sign the standard waiver form to do so.

253. Likewise, Defendants Bynum, Cameron and Small never asked Mr. Palacios to explain each warning back in his own words, or even tell Mr. Palacios that he could read it back, despite him being a minor facing a lengthy prison sentence.

254. In addition, Defendants Bynum, Cameron and Small completely disregarded the constitutional standards regarding the treatment of juvenile suspects being subjected to custodial interrogations.

255. Defendants knew that Mr. Palacios was only fifteen years old at the time, and that, as a very young juvenile, he was substantially more vulnerable than adults to the pressures of coercive custodial interrogations.

256. Yet once Defendants Bynum, Cameron and Small had Mr. Palacios at the police station, they decided to forego any treatment of Mr. Palacios as a fifteen-year-old.

257. As just one example, minors must be advised of their *Miranda* rights upon

being taken into custody, regardless of whether they are to be interrogated.

258. Defendants Bynum, Cameron and Small intentionally and blatantly disregarded this rule, as it stood in the way of their agreement to manufacture and coerce false statements from Mr. Palacios in an attempt to frame both Mr. Palacios and Ms. Pleytez.

259. Defendants Bynum, Cameron, and Small took turns interrogating Mr. Palacios relying upon and working with each other in furtherance of their plan to overbear Mr. Palacios will and attempt to elicit a false confession from Mr. Palacios.

260. Defendants Bynum, Cameron, and Small were aware of the misconduct being perpetrated against Mr. Palacios. Nonetheless, none of them intervened to stop the unconstitutional interrogation, even though all were perfectly able to do so.

261. Defendants Bynum, Cameron, and Small did not intervene because their conduct was part of their intentional and coordinated efforts to coerce Mr. Palacios into making a false confession in order to falsely implicate himself and Ms. Pleytez.

262. Defendants Bynum, Cameron, and Small's coercion of false statements from Mr. Palacios was undertaken pursuant to, and proximately caused by, a policy and practice on the part of the LAPD.

263. The wrongful convictions of innocent persons who gave coerced and false confessions include numerous cases in which LAPD detectives used the very same tactics that Defendants Bynum, Cameron, and Small employed against Mr. Palacios in this case, including (a) physical contact; (b) psychological intimidation and manipulation; (c) feeding suspects unknown information about the crime; (d) threats and intimidation; (e) concealment of exculpatory information; (f) false promises of leniency in exchange for a confession; and (g) other unlawful tactics to secure the arrest, prosecution, and conviction of persons, including juveniles and teenagers, without regard to their actual guilt.

264. At the time of the events leading to Mr. Palacios' coerced confession and wrongful conviction, the LAPD systematically promoted the malicious prosecution of teenagers and other vulnerable individuals by using abusive and coercive interrogation

tactics to force them to confess to crimes they did not commit.

265.   For example, Art Tobias was exonerated in 2015 after it was revealed that LAPD detectives engaged in a psychological intimidation and coerced a false confession from Mr. Tobias, who was only thirteen years old at the time of his interrogation.

266.   Similarly, in 2011, LAPD officers extracted a false confession from a juvenile in the shooting of Wilbert Gaitan, leading to false criminal charges against him.  Video surveillance illustrated the falsity of the confession and even spokeswoman for the Los Angeles County District Attorney's office even dubbed the confession as "false."

267.   Likewise, in 2011, a court found that LAPD officers had coerced Edward Arch, who was nineteen at the time of his 2007 arrest and spent more than three years in jail awaiting trial, into confessing and dismissed the criminal case on that basis.

268.   Years before, LAPD officers extracted a false and coerced confession from Harold Hall in 1985, whose conviction was ultimately dismissed in 2004.

269.   Similarly, David Allen Jones was exonerated by DNA testing which proved that he had not committed the 1992 crimes for which he was convicted after LAPD detective extracted a false confession from Mr. Jones.

270.   As a matter of both policy and practice, municipal policy makers and LAPD supervisors condoned and facilitated a code of silence within the department.  In accordance with this code, LAPD detectives and supervisors refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

271.   In addition, despite the scores of documented cases of unlawful interrogations involving juveniles, the LAPD has undertaken no steps to ensure that civilians, and particularly juvenile suspects, are afforded protection and not coerced into falsely confessing to a crime they did not commit.

272.   Indeed, the City of Los Angeles has refused to initiate reforms despite the fact of its knowledge of the need for reform to prevent false and coerced confessions of juveniles due to their vulnerability.

COMPLAINT FOR DAMAGES AND OTHER RELIEF

273. In addition, the City of Los Angeles has not disciplined its officers for their failures in the investigative process, including their violations of a suspect's constitutional rights and for not even following department policy, as happened here.

### The Unconstitutional and Coercive Interrogation Tactics Employed
### by the Individual Officers Against Ms. Pleytez

274. While Mr. Palacios was being interrogated, Defendants Bynum and Cameron chained and handcuffed a pregnant, 20-year-old Ms. Pleytez to a chair in a separate interrogation room.

275. Defendants Bynum and Cameron lied to Ms. Pleytez and falsely claimed that they knew she committed a murder based on evidence they collected.

276. In fact, the truth was that the LAPD and the Individual Officers obtained absolutely no physical evidence whatsoever linking Mr. Palacios or Ms. Pleytez to the murder of Hector Flores.

277. Like Mr. Palacios, Ms. Pleytez repeatedly denied any involvement in the murder and stated she had no idea what they were talking about.

278. Ms. Pleytez stood firm in her position that she did not commit the murder and told detectives, "*I didn't do anything. You guys want me to lie and say that I was there when I wasn't.*"

279. Despite her invocation of her Fifth Amendment rights, Detective Cameron continued to question her.

280. Ultimately, Ms. Pleytez's interrogation ended once Ms. Pleytez insisted once again on having a lawyer present and telling detectives she had no information to offer them about the murder.

### Defendants Bynum, Flores, and Gable Fabricated Evidence to Suggest that
### Ms. Pleytez Matched the Description of the Driver and Withheld Key Evidence

281. Leading up to the murder conviction, Defendant Flores demonstrated clear animosity toward Ms. Pleytez and her family and repeatedly terrorized the Pleytez family by stating that he would put Ms. Pleytez and her—now deceased—brother, Brian Pleytez

in prison for life by planting evidence.  Defendant Flores told Ms. Pleytez's mother, Carla Campos, several times that he would frame Ms. Pleytez and get away with it and that nobody would ever believe her.

282.    Ms. Campos made numerous Internal Affairs complaints against Defendant Flores as a result of his conduct leading up to Ms. Pleytez's arrest, but these Internal Affairs complaints were withheld, suppressed, and hidden at trial.

283.    In addition, Defendant Flores lied at trial and claimed that no Internal Affairs complaint or other complaints of misconduct were made by Ms. Campos, thereby depriving the jury of the benefit of establishing Defendant Flores' motive to frame Ms. Pleytez and secure a wrongful conviction.

284.    During the trial, Defendant Flores repeatedly smirked and made faces toward Ms. Pleytez in an effort to taunt and intimidate her.

285.    At trial, Defendant Flores testified as a gang expert about the make-up of the White Fence street gang, the murder investigation itself, and about prior contacts with Ms. Pleytez and Mr. Palacios.

286.    Defendant Flores ultimately knew that Ms. Pleytez was innocent and realized that Ms. Pleytez did not match the physical description of the driver.

287.    For example, Benkiran testified that the driver had "red tinted" hair at trial.

288.    However, no police reports, arrest reports, or investigative notes produced leading up to trial suggested that the driver had "red tinted" hair.

289.    Furthermore, none of the statements made by Enciso or Yi suggested that the driver had "red tinted" hair.

290.    Realizing this evidentiary dilemma, Defendants Bynum, Gable, and Flores concocted and manufactured a police report sometime after April 28, 2009—*over two years after the crime occurred*—which stated for the first time, "*I realized that pertinent information regarding Victim Benkiran's identification of Ms. Pleytez wasn't included in the follow up*" and for the first time stated that Ms. Pleytez somehow had a "*red tint*" in her hair *two years prior* by claiming that Defendant Flores visited Ms. Pleytez's residence of

32

April 12, 2007 after "coincidentally" performing check on Brian Pleytez, then somehow observed Ms. Pleytez with "red tinted" hair.

291.   On information and belief, Defendants Bynum, Gable, and Flores knew that this information was false because Brian Pleytez was incarcerated on April 12, 2007 and Defendants Bynum, Gable, and Flores knew, or should have known, that Brian Pleytez was not home on April 12, 2007 to perform a supposed probation check on.

292.   Instead, Defendants Bynum, Gable, and Flores concocted a scheme in which they would visit Ms. Pleytez's residence on the false premise that they were there to visit Brian Pleytez.

293.   When Defendant Flores arrived at Ms. Pleytez's residence for the supposed "probation check," Defendant Flores began asking Ms. Pleytez to exit the house so that she can speak to him.

294.   Ms. Pleytez exited the house and was observed with brown hair, at which point Defendant Flores began questioning Ms. Pleytez, "*Did you ever have red tinted hair before?*"

295.   Defendant Gable admitted in his 2009 report that he withheld the report regarding this encounter with Ms. Pleytez for a period of over two years.

296.   In an effort to frame Ms. Pleytez, Defendant Flores and Defendant Gable falsely documented two years later that Ms. Pleytez had "red tinted" hair on April 12, 2007 when Defendant Flores had visited Ms. Pleytez's residence on the pretext of conducting a purported probation check on Ms. Pleytez's brother, Brian Pleytez.

297.   After producing this report two years later, Defendant Flores then testified falsely at trial that he observed Ms. Pleytez with "red tinted" hair on April 12, 2007.

298.   In the 2009 report, Defendant Gable claimed that he made the report *two years later* after consulting with Deputy District Attorney Dayan Mathai and Defendant Bynum and admitted that he never handed over this key piece of information.

299.   The 2009 report was provided only after testimony had already been made by Benkiran at the preliminary hearing stage describing the driver as having "red tinted" hair.

COMPLAINT FOR DAMAGES AND OTHER RELIEF

300. Notably, Defendant Bynum had interviewed Benkiran on April 11, 2007 and none of her investigative notes suggest that the driver had "red tinted" hair.

301. In fact, a more comprehensive follow-up report made on July 12, 2007 written by Defendant Bynum summarizes all of the statements by Benkiran, Enciso, and Yi and made no mention of "red tint" anywhere in the follow-up report.

302. In sum, Defendants Bynum, Gable, and Flores worked in concert with one another to fabricate evidence two years into the criminal proceedings in an attempt to frame Ms. Pleytez to match Benkiran's testimony but admitted to withholding this key piece of evidence throughout Mr. Palacios and Ms. Pleytez's criminal proceedings for two years.

303. The Individual Officers knew that a criminal defendant's Fifth and Fourteenth Amendment rights to be free from investigation and prosecution based on fabricated evidence had been clearly established at the time of the proceedings against Mr. Palacios. *See e.g. Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001).

304. The withholding of this critical evidence throughout the criminal proceedings severely prejudiced both Mr. Palacios and Ms. Pleytez's ability to investigate the identity of the true perpetrators and demonstrate that the police arrested the wrong two individuals for the murder of Hector Flores.

**As a Result of the City of Los Angeles and the Individual Officers' Misconduct, Mr. Palacios and Ms. Pleytez Were Wrongfully Convicted and Imprisoned**

305. Following Mr. Palacios' arrest, despite his age, Mr. Palacios was prosecuted as an adult.

306. Similarly, Mr. Palacios interjected multiple times throughout the proceedings to profess his innocence.

307. During opening statements, Mr. Palacios shouted, "*It's not me, man.*"

308. At the time Mr. Palacios waived his right to testify, he stated, "*I am innocent.*"

309. At the time the verdict was read, Mr. Palacios begged with the court for mercy and stated, "*Your Honor, how can they do this to us? We are innocent, man. You have the wrong people,*" and further stated, "*We are innocent. Please. You don't understand.*"

310.    At the time of sentencing, Mr. Palacios pleaded with the court once again, by stating, "*I'm innocent, Miss. This is unfair. It wasn't even me. Look at the victim – she said she uses crack. The other witness – my mind gets better the older I get. How is that possible, Miss? We're innocent. And Elizabeth (phonetic), the other witness – she said it wasn't even me. I'm innocent, your Honor.*"

311.    Similarly, Ms. Pleytez remarked at sentencing that: "*This is unfair. The system is not fair. It's not fair.*"

312.    At the ripe of eighteen-years-old, Mr. Palacios was quickly shuffled into a maximum-security California prison, and forced to spend his youth in the prison system.

313.    Similarly, Ms. Pleytez was immediately transferred to a maximum-security women's prison at the Central California Women's Facility.

314.    No physical or documentary evidence linked Mr. Palacios or Ms. Pleytez to the murder of Hector Flores.

315.    The Individual Officers' intentional, willful, and malicious suppression of exculpatory information severely prejudiced both Mr. Palacios and Ms. Pleytez.  Without the benefit of this information, Mr. Palacios and Ms. Pleytez were arrested, tried, and convicted for a shooting and murder that neither of them committed.

316.    Any judicial determination of probable cause to suspect Mr. Palacios and Ms. Pleytez was the result of fabrications and/or the suppression of exculpatory material information by the Individual Officers.

317.    The Individual Officers' suppression of exculpatory information severely prejudiced Mr. Palacios and Ms. Pleytez.  Without the benefit of this information, Mr. Palacios and Ms. Pleytez were tried and convicted for a shooting and murder that neither of them committed.

318.    The above-mentioned conduct and actions by the LAPD and the Individual Officers demonstrate a policy, practice, and custom of violating the constitutional rights of criminal suspects, including by intentionally withholding exculpatory evidence, failing to investigate the actual perpetrators, fabricating evidence, engaging in unlawfully suggestive

identification practices, and pressuring witnesses to provide false testimony.

319.   Mr. Palacios and Ms. Pleytez's convictions are a product of the LAPD's customs and practices of violating the rights of suspects and shielding its officers from meaningful supervision and discipline.

320.   The City of Los Angeles' failure to train, supervise, and discipline its officers effectively condones, ratifies, and sanctions the kind of misconduct that the Individual Officers have committed against Mr. Palacios in this case.

321.   Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the City of Los Angeles' practices and de facto policies.

322.   LAPD condoned and cultivated a culture of impunity and police misconduct which caused Mr. Palacios and Ms. Pleytez's wrongful convictions.

323.   The policies and practices described herein were consciously approved by City of Los Angeles policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

324.   At all times relevant to the events described in this complaint and for a period of time before, the City of Los Angeles had notice of a practice and custom by officers and agents of the Los Angeles Police Department and/or City of Los Angeles pursuant to which individuals suspected of criminal activity, like Mr. Palacios, were convicted based on identifications from unduly suggestive photo arrays and/or due to convictions where material evidence was unlawfully suppressed.

325.   In addition, at all times relevant to the events described in this complaint and for a period of time before, the City of Los Angeles had notice of practices and customs of officers and agents of the Los Angeles Police Department and/or City of Los Angeles that included one or more of the following: (1) officers improperly implementing suggestive photo arrays; (2) officers failing to disclose material information; (3) officers failing to maintain and/or preserve evidence and/or destroying evidence; (4) officers engaging in coercive and unconstitutional interrogation tactics; and/or (5) officers pursuing wrongful convictions through profoundly flawed investigations.

326.    These practices and customs, individually and/or together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Los Angeles directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses like those affecting Mr. Palacios.

327.    The above practices and customs, so well settled as to constitute de facto policies of the City of Los Angeles, were able to exist and thrive, individually and/or together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

328.    That the policies, practices, and customs of the City of Los Angeles cause grave harm like that experienced by Mr. Palacios, and that the need for training is obvious, is evident from the fact that these policies, practices, and customs, and the failure to train, have repeatedly caused the wrongful convictions of other Californians. Examples of similar wrongful convictions include:

    a.  Roy Alvarez, who was exonerated in 2002 after spending seven years in prison for an armed robbery he did not commit, due to an unduly suggestive identification procedure conducted by the Los Angeles Police Department;

    b.  Glenn Barner, who was wrongfully convicted of armed robbery based on the Los Angeles Police Department's faulty identification procedures and subsequently exonerated in 1993;

    c.  Jason Kindle, whose conviction was reversed in 2003 after the Los Angeles Police Department conducted unduly suggestive photo array to cause his conviction;

    d.  Deandre Howard, who was exonerated in 2013 after ten years in prison for a murder conviction founded on a faulty photographic lineup conducted by the Los Angeles Police Department;

COMPLAINT FOR DAMAGES AND OTHER RELIEF

e.  Luis Vargas, who was wrongfully convicted due to the suppression of exculpatory evidence and via faulty misidentifications by LAPD and subsequently exonerated in 2016;

f.  Art Tobias, who was exonerated in 2015, and whose wrongful conviction was the result of, among other things, coercive interrogation tactics employed on a juvenile and the suppression of evidence of an alternative suspect whom LAPD detectives themselves believed was involved in the crime;

g.  Derrick Harris, who was exonerated in 2020, and whose wrongful conviction was secured through unduly suggestive photo identification procedures;

h.  Giovanni Hernandez, who was exonerated in 2023, and whose wrongful conviction was secured through unduly suggestive photo identification procedures and the withholding of exculpatory evidence.

329.  As a consequence, the final policymakers for the City of Los Angeles approved of, adopted, and therefore ratified the actions of the Individual Officers, including their violations of Mr. Palacios' constitutional rights, making the City of Los Angeles liable for this misconduct.  In fact, on information and belief, rather than taking steps to correct the obvious faults and failures with the investigation, including through training or discipline, the final policy makers for the City of Los Angeles further ratified the actions of the Individual Officers by continuing to employ them, promote them, and approve of their work on the Hector Flores murder that resulted in Mr. Palacios' wrongful conviction.

330.  When conducting the unduly suggestive and corrupted photo arrays, the Individual Officers followed standard practice they had been taught by the Los Angeles Police Department. The LAPD failed to provide adequate written policies or other procedural safeguards concerning the creation or administration of photographic lineups including the selection of filler photographs.  These inadequate policies caused the violation of Mr. Palacios' rights here.

331.  The City of Los Angeles employed the Individual Defendants, supervised them, and promulgated policy, including written policies and unwritten customs, that

caused the wrongful conviction of Mr. Palacios, including by manufacturing police reports, fabricating testimony, manipulating witnesses by using unduly suggestive identification techniques, withholding exculpatory evidence, and engaging in coercive and unconstitutional interrogation practices in interrogating minors.

332. Mr. Palacios' injuries described in this complaint and the violations of his constitutional rights discussed above were caused by the policies and customs of the City of Los Angeles, as well as by the actions of policy-making officials for the City of Los Angeles.

333. At all times relevant to the events described in this complaint and for a period of time before and after, the City of Los Angeles failed to promulgate proper or adequate rules, regulations, policies, and procedures governing: the conducting of photo array procedures; the collection, documentation, preservation, and disclosure of evidence, including material exculpatory evidence; writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and the maintenance of investigative files and disclosure of those files in criminal proceedings.

334. In addition or alternatively, the City of Los Angeles failed to promulgate proper and adequate rules, regulations, policies, procedural safeguards, and procedures for the training and supervision of officers and agents of the Los Angeles Police Department, with respect to the conducting of photo array procedures; the collection, documentation, preservation, and disclosure of evidence, including material exculpatory evidence; writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and the maintenance of investigative files and disclosure of those files in criminal proceedings.

335. Mr. Palacios is informed and believes and thereon alleges that Defendant City of Los Angeles, by and through the Los Angeles Police Department, with deliberate indifference, and conscious and reckless disregard to the safety, security and constitutional and statutory rights of criminal suspects, including Mr. Palacios and Ms. Pleytez, had no established or clear policy, did not provide adequate training and supervision, and/or

otherwise failed to carry out their responsibilities regarding the following issues:

    a.  maintaining a basic and standardized *Brady* policy that outlines and identifies the *Brady* obligations of officers;

    b.  ensuring that all exculpatory evidence was prominently communicated in a manner likely to ensure that it would be seen and understood by both the prosecution and defense;

    c.  ensuring that its police officers provided its full investigative material in a case submitted to the District Attorney's Office, including but not limited to *Ramey* warrant materials and any investigative materials or notes;

    d.  ensuring that all exculpatory evidence was referenced in the key case reports and documents, especially those summarizing the evidence;

    e.  ensuring that officers who hear false testimony call that fact to the attention of the prosecutor;

    f.  ensuring that the interactions between a witness and a detective are fully and completely provided in a prominent written report;

    g.  ensuring that eyewitness identification procedures complied with the requirements of due process, including those set out in *Manson v. Braithwaite* and *Neil v. Biggers*;

    h.  ensuring that police personnel, whether through inadvertence or design, did not provide information to potential eyewitnesses that improperly influenced the identification;

    i.  preventing the use of suggestive eyewitness identification procedures;

    j.  ensuring that eyewitness identifications were reliable and free of improper influence;

    k.  preventing false evidence by omission of material information;

    l.  preventing the use of misleading descriptions of events that provide a false impression;

    m. establishing procedures to ensure that activity in related court cases but with

40

a different case number (e.g., *Ramey* warrant cases) were treated as exculpatory evidence and forwarded prominently to the District Attorney's Office and the trial Deputy District Attorney;

n.  establishing procedures to ensure that any benefits or monies paid to or for the benefit of witnesses were treated as exculpatory evidence and forwarded prominently to the District Attorney's Office and the trial Deputy District Attorney;

o.  ensuring detectives' compliance with constitutional standards regarding false evidence, *Brady*, or eyewitness identification procedures;

p.  adequately investigating incidents involving the fabrication of evidence, wrongful influence of identifications, suppression or burying of exculpatory information or other misconduct by its officers, or complaints of such conduct;

q.  conducting investigations in such a manner as to conceal the misconduct of its officers;

r.  condoning and encouraging the fabrication of evidence, including but not limited to the presentation of materially false investigative reports.

336.  Officers and agents of the City of Los Angeles committed these failures to promulgate proper or adequate rules, regulations, policies, and procedures.

337.  Had officers and agents of the City of Los Angeles promulgated appropriate policies, then the violation of Mr. Palacios' constitutional rights would have been avoided.

**The Exoneration of Mr. Palacios and Ms. Pleytez**

338.  As a direct result of the conduct and actions of the LAPD and the Individual Officers, Mr. Palacios and Ms. Pleytez were wrongfully convicted of murder and were wrongfully incarcerated from May 30, 2007 until December 20, 2024.

339.  The current District Attorney of Los Angeles County, Nathan Hochman, and his predecessor, George Gascon, both agreed that Mr. Palacios and Ms. Pleytez were wrongfully convicted and both Mr. Hochman and Mr. Gascon advocated that their

1  convictions be vacated and that they be found factually innocent.

2  340.  On December 20, 2024, the convictions of Mr. Palacios and Ms. Pleytez were

3  ultimately overturned after the Los Angeles County District Attorneys' Office worked

4  jointly with a team of pro bono lawyers to request that the convictions be vacated and that

5  Mr. Palacios and Ms. Pleytez both be found factually innocent.

6  341.  On February 25, 2025, Mr. Palacios and Ms. Pleytez were both determined to

7  be factually innocent of the murder that they were convicted of.

8  342.  Without the misconduct of the LAPD and its officers, Mr. Palacios and Ms.

9  Pleytez would have never been unlawfully arrested, convicted, and incarcerated.

10  343.  Both Mr. Palacios and Ms. Pleytez have suffered irreparably and will never

11  regain the foundational years of their life.

**The Damages Suffered by Lombardo Palacios**

13  344.  Mr. Palacios spent seventeen-and-a-half years wrongfully incarcerated for a

14  crime he did not commit and had no part in.

15  345.  At the young age of fifteen-years-old, Mr. Palacios' whole life was turned

16  upside down without any warning when he was taken away from his family and friends.

17  346.  As a result of the wrongful conviction and conduct of the LAPD and the

18  Individual Officers, Mr. Palacios was robbed of his life as a young man, spending the rest

19  of his childhood and the entirety of his twenties wrongfully incarcerated.

20  347.  Mr. Palacios was deprived of all of the basic pleasures of human experience,

21  which all free people enjoy as a matter of right, including the freedom to live one's life as

22  an autonomous human being.

23  348.  Mr. Palacios has lost the opportunity to grow and develop as a young man.

24  349.  During Mr. Palacios' incarceration, he suffered immeasurable emotional

25  distress damages, leading him to attempt to commit suicide multiple times.

26  350.  Towards the end of his incarceration, Mr. Palacios was transferred to the

27  California Medical Facility after a failed suicide attempt.

28  351.  Mr. Palacios lost the best years of his youth and life and was forced to grow

up in a prison cell at the young age of fifteen years old.

352.    Mr. Palacios went year after year without seeing his mother, sister, or family and endured suffering during his incarceration.

353.    Having grown up in prison, Mr. Palacios has spent more time incarcerated than being free.

354.    Mr. Palacios was unable to spend holidays or share life events with his family while he was wrongfully incarcerated.

355.    Mr. Palacios returned home to relationships changed or lost by years away and continues to struggle as he attempts to rebuild his life.

356.    Mr. Palacios lost the opportunity to start a career and now faces tremendous challenges adjusting back to life in the free world.

357.    In addition to causing Mr. Palacios the emotional trauma of wrongful imprisonment, loss of his liberty, great mental anguish, reputational harm, the City of Los Angeles and the Individual Defendants' misconduct continues to cause Mr. Palacios physical and psychological pain and suffering, humiliation, fear, anxiety, depression, and despair, rage, and other physical and psychological harms.

### The Damages Suffered by Claudia Ortiz

358.    Mr. Palacios was only fifteen years old when he was stripped away from his mother, Claudia Ortiz, after being falsely arrested and wrongfully prosecuted.

359.    Because of the Individual Officers' intentional misconduct, Ms. Ortiz was robbed of her son. Instead of sharing birthdays, holidays, graduations, and daily life with her son, her contact was limited to jail and prison visits and phone calls.

360.    Ms. Ortiz's loss of the familial relationship with Mr. Palacios caused extreme mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

///

///

///

COMPLAINT FOR DAMAGES AND OTHER RELIEF

**FIRST CAUSE OF ACTION**

**(42 U.S.C. § 1983: Fourteenth Amendment / Deliberate Fabrication of Evidence**

**(By Plaintiff Lombardo Palacios Against the Individual Officers)**

361. Mr. Palacios realleges all paragraphs contained in the Introduction, General Allegations, Factual Background sections of this Complaint, and the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

362. The Individual Officers acted under color of state law.

363. The Individual Officers deliberately fabricated evidence that was used to criminally charge, prosecute, and convict Mr. Palacios.

364. The Individual Officers continued their investigation of Mr. Palacios despite the fact that they knew that Mr. Palacios was innocent, or were deliberately indifferent to Mr. Palacios' innocence, and the results of the investigation were used to criminally charge, prosecute, and convict Mr. Palacios.

365. The Individual Officers used techniques that were so coercive and abusive that they knew, or were deliberately indifferent, that those techniques would yield false information that was used to criminally charge, prosecute, and convict Mr. Palacios.

366. The fabricated evidence asserted herein is comprised of material omissions as well as affirmatively false and misleading statements in police reports and documents prepared in connection with the investigation in the Hector Flores murder, and includes but it not limited to: fabricating evidence in both reports and testimony that witnesses Enciso and Yi had only selected Mr. Palacios and Ms. Pleytez, when in fact, Enciso and Yi had selected and identified other suspects; fabrication of evidence in the *Ramey* warrant which omitted critical evidence that Enciso and Yi had selected other suspects; the omission in police reports, arrest reports, and other reports that Benkiran was not able to identify Mr. Palacios when first shown his photograph on April 11, 2007; the fabrication of evidence in reports which stated that Mr. Palacios had "confessed" to the crime despite inconsistencies in statements made in his unlawful interrogation that objective did not match the description of how the crime occurred; the use of unlawful and impermissibly suggestive

photo identification procedures to manufacture that Benkiran, Enciso, and Yi had selected
Mr. Palacios and Ms. Pleytez; the manufacturing of Defendant Gable's 2009 report
described above falsely describing Ms. Pleytez as having "red tinted" hair; causing Enciso
and Yi to provide the false and misleading impression that they had selected only Mr.
Palacios and Ms. Pleytez despite having selected other suspects; the pressuring of witnesses
Enciso and Yi to select Mr. Palacios and Ms. Pleytez only in order to manufacture a false
identification of Mr. Palacios and Ms. Pleytez; omitting critical information in reports that
B.R. and R.N. were actually the culprits responsible for the murder of Hector Flores.

367.    The Individual Officers' actions deprived Mr. Palacios of his constitutional
right to due process under the Fifth and Fourteenth Amendments.

368.    The Individual Officers' conduct was an actual cause of Mr. Palacios' injuries.

369.    The Individual Officers' misconduct was undertaken pursuant to the City of
Los Angeles' policies, which are more fully described above and below.

370.    As a result, Mr. Palacios suffered loss of liberty, great mental anguish,
humiliation, degradation, physical and emotional pain and suffering, and other grievous
and continuing injuries and damages, as described more fully above and below, in an
amount according to proof at the time of trial in this matter.

## SECOND CAUSE OF ACTION

### (42 U.S.C. § 1983:  Fourteenth Amendment / Deliberate or Reckless
### Suppression of Evidence and *Brady* Violations)

### (By Plaintiff Lombardo Palacios Against the Individual Officers)

371.    Mr. Palacios realleges all paragraphs contained in the Introduction, General
Allegations, Factual Background sections of this Complaint, and the foregoing and any
subsequent paragraphs contained in the complaint, as if fully set forth herein.

372.    The Individual Officers acted under color of state law.

373.    The Individual Officers suppressed evidence that was favorable to Mr.
Palacios in violation of his right to have material exculpatory evidence and information
turned over to the prosecutors handling his case so that it could in turn be provided to the

45

defense as required by *Brady v. Maryland*, 373 U.S. 83 (1963).

374.    The Individual Officers' *Brady* violations asserted herein encompass, but are not limited to: failing to disclose identification of other suspects identified and selected by witnesses Enciso and Yi, failing to reveal in the *Ramey* warrant that Enciso and Yi had selected other suspects in the course of interviews with the Individual Officers, failing to disclose the highly suggestive line-up procedures used by Defendants Bynum and Gable when interviewing Benkiran, Enciso, and Yi, failing to disclose the extent of financial incentives that Benkiran received prior to her testimony, including money, housing, and other financial benefits, failing to disclose Internal Affairs complaints and other complaints made against Defendant Flores by Carla Campos, failing to disclose Defendant Flores' documented encounter with Ms. Pleytez on April 12, 2007 and to produce Defendant Gable's 2009 report, failing to disclose the Individual Officers had influenced and pressured witnesses Enciso and Yi in police reports relied upon by the prosecution, failing to disclosure critical information in reports that B.R. and R.N. were actually the culprits responsible for the murder of Hector Flores.

375.    The suppression harmed Mr. Palacios.

376.    The Individual Officers acted with deliberate indifference to Mr. Palacios' rights or for the truth in suppressing the evidence.

377.    The Individual Officers' actions deprived Mr. Palacios of his constitutional right to due process under the Fifth and Fourteenth Amendments.

378.    The Individual Officers' conduct was an actual cause of Mr. Palacios' injuries.

379.    The Individual Officers' misconduct was undertaken pursuant to the City of Los Angeles' policies, which are more fully described above and below.

380.    As a result, Mr. Palacios suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages, as described more fully above and below, in an amount according to proof at the time of trial in this matter.

///

COMPLAINT FOR DAMAGES AND OTHER RELIEF

## THIRD CAUSE OF ACTION

## (42 U.S.C. § 1983: Fourth Amendment—False Arrest)

## (By Plaintiff Lombardo Palacios Against Defendants Bynum and Cameron)

381.    Mr. Palacios realleges all paragraphs contained in the Introduction, General Allegations, Factual Background sections of this Complaint, and the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

382.    Defendants Bynum and Cameron acted under color of state law.

383.    In applying for an arrest warrant against Mr. Palacios, Defendants Bynum and Cameron deliberately or recklessly made false statements or omissions that were material to the finding of probable cause.

384.    The issuing judge would not have approved the warrant with knowledge that information was false, or with the omitted information included.

385.    Defendants Bynum and Cameron's actions deprived Mr. Palacios of his Fourth Amendment right to be free from unreasonable seizures.

386.    Defendants Bynum and Cameron's conduct was an actual cause of Mr. Palacios' injuries.

387.    Defendants Bynum and Cameron's misconduct was undertaken pursuant to the City of Los Angeles' policies, which are more fully described above and below.

388.    As a result, Mr. Palacios suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages, as described more fully above and below, in an amount according to proof at the time of trial in this matter.

## FOURTH CAUSE OF ACTION

## (42 U.S.C. § 1983: Fourteenth Amendment – Impermissibly Suggestive Identification Procedures – *Manson/Biggers* Violations)

## (By Plaintiff Lombardo Palacios Against Defendants Bynum and Gable)

389.    Mr. Palacios realleges all paragraphs contained in the Introduction, General Allegations, Factual Background sections of this Complaint, and the foregoing and any

47

subsequent paragraphs contained in the complaint, as if fully set forth herein.

390.    Defendants Bynum and Gable acted under color of state law.

391.    Defendants Bynum and Gable deprived Mr. Palacios of his Fifth and Fourteenth Amendment right to have an eyewitness identification that was free from suggestion or influence by police.

392.    The identification procedures deployed by the Individual Officers were impermissibly suggestive and the resulting identifications lacked sufficient indicia of reliability.

393.    Defendants Bynum and Gable acted willingly in deploying the impermissibly suggestive identification procedures, or with deliberate indifference to Mr. Palacios' rights.

394.    The impermissibly suggestive identification procedures violated Mr. Palacios' civil rights by violating his right to have an eyewitness identification by Benkiran, Enciso, and Yi that was free from suggestion or influence by police, as set forth in *Manson v. Brathwaite*, 432 U.S. 98 (1977) and *Neil v. Biggers*, 409 U.S. 188 (1972).

395.    The United States Supreme Court has determined that a pre-trial identification violates due process where: (1) the identification procedures are impermissibly suggestive; and (2) the suggestive procedures give rise to a very substantial likelihood of misidentification, rendering it so unreliable that it was inadmissible.

396.    The facts alleged here demonstrate that the identification procedures employed by the Individual Officers were impermissibly suggestive and lacked the indicia of reliability required under the *Manson-Biggers* test.  Specifically, Benkiran, Enciso, and Yi's opportunity to observe the suspects was limited, as it was dark outside and Benkiran, Enciso, and Yi only observed the suspects for a few seconds.  In addition, Benkiran allegedly saw the assailants while "ducking down" and Benkiran relied on trifocal lenses to correct her poor vision.  A crack cocaine pipe was also found with Benkiran indicating that Benkiran was likely under the influence of crack cocaine after admitting to exchanging crack cocaine in the vicinity ten minutes prior.  Critically, Benkiran was initially shown a photograph of Mr. Palacios on April 11, 2007 but was unable to identify Mr. Palacios in

the first instance. Meanwhile, Enciso and Yi and selected other individuals as possible suspects, but the Individual Officers suppressed and hid this exculpatory information, and instead, directed Enciso and Yi to select only Mr. Palacios and Ms. Pleytez.

397. Defendants Bynum and Gable's acts of improper suggestion and influence include, but are not limited to: constructing a photo line-up based on criteria other than whether the individuals depicted bear any resemblance to the physical description of the suspect provided by the viewing witness; directing Benkiran, Enciso, and Yi to select only Mr. Palacios and Ms. Pleytez's photographs; directing Benkiran to select Mr. Palacios using a standalone one-page photograph after she was unable to identify him as a suspect in the first instance in the gang booklet; the use of a photo arrangement to present Ms. Pleytez's photograph to Benkiran in the gang booklet surrounded by five other male individuals, providing information to Enciso and Yi to suggest that Mr. Palacios and Ms. Pleytez were the "right" suspects; falsely reassuring Ensico and Yi that Mr. Palacios and Ms. Pleytez committed the murder and that the Individual Officers had a "mountain" of evidence and other civilian witnesses confirming so; and failing to employ the standard and required admonishment procedures before presenting Benkiran, Enciso, and Yi with photo arrangements.

398. Defendants Bynum and Gable's conduct was an actual cause of Mr. Palacios' injuries.

399. Defendants Bynum and Gable's misconduct was undertaken pursuant to the City of Los Angeles' policies, which are more fully described above and below.

400. As a result, Mr. Palacios suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages, as described more fully above and below, in an amount according to proof at the time of trial in this matter.

///
///
///
///

# FIFTH CAUSE OF ACTION

## (42 U.S.C. § 1983: Fifth and Fourteenth Amendment –

## Coerced and Inculpatory Statements)

## (By Plaintiff Lombardo Palacios Against Defendants Bynum, Small, and Cameron)

401.    Mr. Palacios realleges all paragraphs contained in the Introduction, General Allegations, Factual Background sections of this Complaint, and the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

402.    In the manner described more fully above, Defendants Bynum, Small, and Cameron, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, conducted an unconstitutional interrogation of Mr. Palacios, and coerced him into making involuntary statements implicating himself to incriminate himself falsely and against his will, in violation of Mr. Palacios' rights secured by the Fifth and Fourteenth Amendments.

403.    As described more fully above, Defendants Bynum, Small, and Cameron conducted an unconstitutional interrogation of Mr. Palacios, which caused Mr. Palacios to make involuntary statements implicating himself and Ms. Pleytez in the murder of Hector Flores, and attempted murder of Lenette Benkiran.

404.    The false statements coerced by Defendants Bynum, Small, and Cameron and made after were used against Mr. Palacios to his detriment in a criminal case in order to secure the conviction of Mr. Palacios.  Other than these false statements, the Individual Officers had absolutely no probable cause and no reason to suspect that Mr. Palacios was responsible for the murder of Hector Flores.

405.    Even though Mr. Palacios' false statements did not credibly match key details of the crime, the Individual Officers nonetheless authored arrest reports by falsely stating that Mr. Palacios "*admitted to the crime*," knowing full well that the false statements made by Mr. Palacios were inaccurate and only included details fed by detectives over the course of hours of interrogation.

406.    The misconduct of the Individual Officers was objectively unreasonable and

COMPLAINT FOR DAMAGES AND OTHER RELIEF

was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Mr. Palacios' innocence.

407.   The Individual Officers' misconduct was undertaken pursuant to the City of Los Angeles' policies, which are more fully described above and below.

408.   As a result of the Individual Officers' violation of Mr. Palacios' constitutional rights, Mr. Palacios suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages, as described more fully above and below.

## SIXTH CAUSE OF ACTION

### (42 U.S.C. § 1983: Malicious Prosecution in Violation of the
### Fourth and Fourteenth Amendments)

### (By Plaintiff Lombardo Palacios Against the Individual Officers)

409.   Mr. Palacios realleges all paragraphs contained in the Introduction, General Allegations, Factual Background sections of this Complaint, and the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

410.   In the manner described more fully above, the Individual Officers, acting as investigators, individually, jointly, and in conspiracy with each other, accused Mr. Palacios of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Mr. Palacios without any probable cause for doing so and in spite of the fact that they knew Mr. Palacios was innocent.

411.   The Individual Officers accused Mr. Palacios of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings against Mr. Palacios.

412.   The Individual Officers made statements regarding Mr. Palacios' purported culpability knowing that those statements were false.  They were aware that, as described more fully above, no true or reliable evidence implicated Mr. Palacios in the shooting.

413.   The Individual Officers unreasonably seized Mr. Palacios without probable

cause and deprived him of his liberty, in violation of his rights secured by the Fourth and Fourteenth Amendments.

414.   The Individual Officers deprived Mr. Palacios of fair state criminal proceedings, including the chance to defend himself during those proceedings, resulting in a deprivation of his liberty.

415.   The Individual Officers subjected Mr. Palacios to arbitrary governmental action that shocks the conscience in that Mr. Palacios was deliberately and intentionally framed for a crime of which he was totally innocent, through Individual Officers' misconduct.  The Individual Officers actions contravened fundamental canons of decency and fairness and violated Mr. Palacios' rights under the Fourteenth Amendment.

416.   The Individual Officers caused Mr. Palacios to be improperly subjected to judicial proceedings for which there was no probable cause.

417.   These judicial proceedings were instituted and continued by Individual Officers maliciously, resulting in injury.

418.   The Individual Officers' misconduct was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

419.   The prosecution terminated in Mr. Palacios' favor when, after his conviction was vacated, the State dismissed the charges against him, and he was found factually innocent of the murder.

420.   The misconduct by the Individual Officers was undertaken pursuant to the policy and practice of the Los Angeles Police Department and the City of Los Angeles, which Mr. Palacios was the victim of, and his injuries were caused by the policies and practices of the City of Los Angeles, as described more fully above and below.

421.   As a result of the Individual Officers' violation of Mr. Palacios' constitutional rights, Mr. Palacios suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages, as described more fully above and below.

///

COMPLAINT FOR DAMAGES AND OTHER RELIEF

## SEVENTH CAUSE OF ACTION

### (42 U.S.C. § 1983: *Monell* – Official Policy, Practice, or Custom))

### (By Plaintiff Lombardo Palacios Against Defendant City of Los Angeles)

422.   Mr. Palacios realleges all paragraphs contained in the Introduction, General Allegations, Factual Background sections of this Complaint, and the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

423.   The Individual Officers acted under color of state law.

424.   The acts of the Individual Officers deprived Mr. Palacios of his Fourth, Fifth, and Fourteenth Amendment rights.

425.   The Individual Officers acted pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of Defendant City of Los Angeles.

426.   Defendant City of Los Angeles' official policy or widespread or longstanding practice or custom caused the deprivation of Mr. Palacios' rights by the Individual Officers; that is, the City of Los Angeles' official policy or widespread or longstanding practice or custom is so closely related to the deprivation of Mr. Palacios' rights as to be the moving force that caused the ultimate injury.

427.   Mr. Palacios' injuries and the constitutional violations he suffered were caused by officers, agents, and employees of the City of Los Angeles, including but not limited to the Individual Officers, who acted pursuant to one or more of the policies, practices, and customs set forth above.

428.   As a direct and proximate result of Defendant City of Los Angeles' acts and omissions, condoning, encouraging, ratifying and deliberately ignoring the pattern and practice of the Individual Officers, Mr. Palacios sustained injury and damage, as described more fully above and below.

## EIGHTH CAUSE OF ACTION

### (42 U.S.C. § 1983: *Monell*—Failure to Train)

### (By Plaintiff Lombardo Palacios Against Defendant City of Los Angeles)

429.   Mr. Palacios realleges all paragraphs contained in the Introduction, General

53

Allegations, Factual Background sections of this Complaint, and the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

430.   The actions and omissions of the Individual Officers deprived Mr. Palacios of his particular rights under the laws of the United States and United States Constitution.

431.   The Individual Officers acted under color of state law.

432.   The training policies of Defendant City of Los Angeles were not adequate to prevent violations of law by its employees or to train its employees to handle the usual and recurring situations with which they must deal.

433.   Defendant City of Los Angeles was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law by its employees or to the known or obvious consequences of its failure to train its employees.

434.   The failure of Defendant City of Los Angeles to prevent violations of law by its employees or to provide adequate training caused the deprivation of Mr. Palacios' rights by the Individual Officers; that is Defendant City of Los Angeles' failure to prevent violations of law by its employees or train played a substantial part in bringing about or actually causing the injury or damage to Mr. Palacios.

435.   As a result, Mr. Palacios suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages, as described more fully above and below, in an amount according to proof at the time of trial in this matter.

## NINTH CAUSE OF ACTION

**(42 U.S.C. § 1983: Fourteenth Amendment: Deprivation of Liberty Without Due Process of Law and Denial of a Fair Trial)**

**(By Plaintiff Lombardo Palacios Against the Individual Officers)**

436.   Mr. Palacios realleges all paragraphs contained in the Introduction, General Allegations, Factual Background sections of this Complaint, and the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

437.   As described herein, the Individual Officers, while acting individually, jointly,

54

and/or in conspiracy with each other, as well as under color of law and within the scope of their employment, deprived Mr. Palacios of his constitutional right to due process and his right to a fair trial.

438.    Defendants fabricated evidence, including by manufacturing police reports, fabricating evidence and testimony, manipulating witnesses Benkiran, Enciso, and Yi, using unduly suggestive identification techniques purporting to connect Mr. Palacios to the crime, withholding exculpatory evidence, and refusing to investigate the actual perpetrators of the crime.

439.    Defendants deliberately withheld exculpatory evidence from Mr. Palacios, his attorneys, and prosecutors, among others, thereby misleading and misdirecting the criminal prosecution—including but not limited to, their own misconduct.

440.    In addition, on information and belief, the Individual Officers concealed and fabricated additional evidence that is not yet known to Mr. Palacios.

441.    The Individual Officers' misconduct resulted in Mr. Palacios' unjust and wrongful criminal prosecution and conviction, deprived him of his liberty, and denied him his constitutional rights protected by the Fourteenth Amendment. Absent this misconduct, Mr. Palacios' prosecution could not and would not have been pursued.

442.    The misconduct by the Individual Officers was objectively unreasonable and was undertaken intentionally with reckless indifference to the rights of others, and with total disregard for the truth and Mr. Palacios' clear innocence.

443.    Without Defendants' fabrication, suppression, and/or destruction of evidence, Mr. Palacios would never have been arrested, charged, prosecuted, or convicted.

444.    The Individual Officers' misconduct was undertaken pursuant to City of Los Angeles' policies, which are more fully described above and below.

445.    As a result of the Defendants' and each of their, violation of Mr. Palacios' constitutional rights and misconduct, Mr. Palacios suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages, as described more fully above and below.

## TENTH CAUSE OF ACTION

### (42 U.S.C. § 1983: Deprivation of Civil Rights – Illegal Detention)

### (By Plaintiff Lombardo Palacios Against the Individual Officers)

446.   Mr. Palacios realleges all paragraphs contained in the Introduction, General Allegations, Factual Background sections of this Complaint, and the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

447.   In the manner described more fully above, the Individual Officers, individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, accused Mr. Palacios of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Mr. Palacios without any probable cause for doing so, in violation of his rights secured by the Fourth Amendment (as incorporated by the Fourteenth Amendment).

448.   In so doing, the Individual Officers caused Mr. Palacios to be deprived of his liberty and detained without probable cause and subjected improperly to judicial proceedings for which there was no probable cause.

449.   The misconduct was objectively unreasonable and was undertaken intentionally and with reckless disregard for Mr. Palacios' rights.

450.   The Individual Officers' misconduct was undertaken pursuant to the City of Los Angeles' policies, which are more fully described above and below.

451.   As a result of the Defendants' and each of their, violation of Mr. Palacios' constitutional rights and misconduct, Mr. Palacios suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages, as described more fully above and below.

## ELEVENTH CAUSE OF ACTION

### (42 U.S.C. § 1983: Deprivation of Civil Rights – Failure to Intervene)

### (By Plaintiff Lombardo Palacios Against the Individual Officers)

452.   Mr. Palacios realleges all paragraphs contained in the Introduction, General Allegations, Factual Background sections of this Complaint, and the foregoing and any

subsequent paragraphs contained in the complaint, as if fully set forth herein.

453.   In the manner described above, during the constitutional violations described herein, one or more of the Individual Officers stood by without intervening to prevent the violation of Mr. Palacios' constitutional rights, even though they had the duty and the opportunity to do so.

454.   The Individual Officers had a duty and reasonable opportunity to prevent this harm to Mr. Palacios, but they failed to do so.

455.   The Individual Officers' misconduct was objectively unreasonable and was undertaken intentionally with willful indifference to Mr. Palacios' constitutional rights.

456.   The Individual Officers' misconduct was undertaken pursuant to the City of Los Angeles' policies, which are more fully described above and below.

457.   As a result of the Defendants' and each of their, misconduct and their failure to intervene to prevent the violation of Mr. Palacios' constitutional rights, Mr. Palacios suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages, as described more fully above and below.

## TWELFTH CAUSE OF ACTION

### (42 U.S.C. § 1983: Conspiracy to Deprive Constitutional Rights)

### (By Plaintiff Lombardo Palacios Against the Individual Officers)

458.   Mr. Palacios realleges all paragraphs contained in the Introduction, General Allegations, Factual Background sections of this Complaint, and the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

459.   The Individual Officers reached an agreement among themselves to falsely implicate and prosecute Mr. Palacios for Hector Flores' murder, and thereby to deprive Mr. Palacios of his constitutional rights, as described above.  This agreement was first reached before arresting Mr. Palacios, and it remained in place throughout all periods of his wrongful detention, prosecution, and incarceration.

460.   In addition, the Individual Officers conspired before Mr. Palacios' conviction,

and continued to conspire after his conviction, to deprive Mr. Palacios of exculpatory material to which he is entitled and that would have led to his earlier exoneration.

461.    In this manner, the Individual Officers, acting in concert with each other and with other co-conspirators, known and unknown, conspired by concerted action to accomplish an unlawful purpose and/or a lawful purpose by unlawful means.

462.    In furtherance of the conspiracy, each co-conspirator committed overt acts and was an otherwise willful participant in joint activity.

463.    The misconduct was objectively unreasonable and was undertaken intentionally and with reckless disregard for Mr. Palacios' rights.

464.    The Individual Officers' misconduct was undertaken pursuant to the City of Los Angeles' policies, which are more fully described above and below.

465.    As a result of the Defendants' and each of their, violation of Mr. Palacios' constitutional rights and misconduct stemming from this illicit prior agreement, Mr. Palacios suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages, as described more fully above and below.

## THIRTEENTH CAUSE OF ACTION

### (State Law – California Civil Code § 52.1 – *Bane* Act)

### (By Plaintiff Lombardo Palacios Against All Defendants)

466.    Mr. Palacios realleges all paragraphs contained in the Introduction, General Allegations, Factual Background sections of this Complaint, and the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

467.    By threats, intimidation, or coercion, the Individual Officers caused Mr. Palacios to reasonably believe that if he exercised his Fifth, Sixth, and Fourteenth Amendment rights, the Individual Officers would commit violence against him and had the apparent ability to carry out the threats.

468.    The Individual Officers intended to deprive Mr. Palacios of his enjoyment of the interests protected by his Fifth, Sixth, and Fourteenth Amendment rights.

469.   Mr. Palacios was harmed.

470.   The Individual Officers' conduct was a substantial factor in causing Mr. Palacios' harm.

471.   The Individual Officers' misconduct was undertaken pursuant to the City of Los Angeles' policies, which are more fully described above and below.

472.   The City of Los Angeles is vicariously liable for the Individual Officers' actions because they were committed within the course and scope of their employment as LAPD officers.

473.   As a result, Mr. Palacios suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages, as described more fully above and below, in an amount to be proven at the time of trial in this matter.

## FOURTEENTH CAUSE OF ACTION

### (State Law – False Imprisonment)

### (By Plaintiff Lombardo Palacios Against All Defendants)

474.   Mr. Palacios realleges all paragraphs contained in the Introduction, General Allegations, Factual Background sections of this Complaint, and the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

475.   The Individual Officers arrested Mr. Palacios or intentionally caused Mr. Palacios to be wrongfully arrested.  To secure the false arrest of Mr. Palacios, the Individual Officers wrote reports during their investigation, which included false statements and material omissions which make them misleading, and which exclude favorable and exculpatory information of his innocence.

476.   There was never any probable cause to believe that Mr. Palacios was involved in any way in the murder of Hector Flores.

477.   Instead, any assertion of probable cause was made on the basis of the Individual Officers' unreliable and fabricated evidence after failing to disclose favorable evidence pointing away from Mr. Palacios and withholding the fact that Enciso and Yi had

identified other possible individuals.

478.    The *Ramey* search and arrest warrants were also obtained on the false premise that Enciso and Yi had identified and selected only Mr. Palacios during the identification procedures and contained no information about the impermissibly suggestive identification procedures used by the Individual Officers during those examinations.

479.    This misleading false impression was not accidental and was done for the sole purpose of fabricating evidence to falsely arrest Mr. Palacios.

480.    Mr. Palacios was actually harmed.

481.    The Individual Officers' conduct was a substantial factor in causing Mr. Palacios' harm.

482.    The Individual Officers' misconduct was undertaken pursuant to the City of Los Angeles' policies, which are more fully described above and below.

483.    The City of Los Angeles is vicariously liable for the Individual Officers' actions because they were committed within the course and scope of their employment as LAPD officers.

484.    As a result of the Individual Officers' actions, Mr. Palacios suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages, as described more fully above and below, in an amount to be proven at the time of trial in this matter.

## FIFTEENTH CAUSE OF ACTION

### (State Law – Negligence)

### (By Plaintiff Lombardo Palacios Against All Defendants)

485.    Mr. Palacios realleges all paragraphs contained in the Introduction, General Allegations, Factual Background sections of this Complaint, and the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

486.    The Individual Officers were negligent.

487.    Mr. Palacios was harmed.

488.    The Individual Officers' negligence was a substantial factor in causing Mr.

Palacios' harm.

489.   The Individual Officers' misconduct was undertaken pursuant to the City of Los Angeles' policies, which are more fully described above and below.

490.   The City of Los Angeles is vicariously liable for the Individual Officers' actions because they were committed within the course and scope of their employment as LAPD officers.

491.   As a result of the Individual Officers' actions, Mr. Palacios suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages, as described more fully above and below, in an amount to be proven at the time of trial in this matter.

## SIXTEENTH CAUSE OF ACTION

### (State Law – Intentional Infliction of Emotional Distress)

### (By Plaintiff Lombardo Palacios Against All Defendants)

492.   Mr. Palacios realleges all paragraphs contained in the Introduction, General Allegations, Factual Background sections of this Complaint, and the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

493.   The Individual Officers' conduct was outrageous.

494.   The Individual Officer intended to cause Mr. Palacios emotional distress or acted with reckless disregard of the probability that Mr. Palacios would suffer emotional distress, knowing that Mr. Palacios was present when the conduct occurred.

495.   Mr. Palacios suffered severe emotional distress.

496.   The Individual Officers' conduct was a substantial factor in causing Mr. Palacios' severe emotional distress.

497.   The Individual Officers' misconduct was undertaken pursuant to the City of Los Angeles' policies, which are more fully described above and below.

498.   The City of Los Angeles is vicariously liable for the Individual Officers' actions because they were committed within the course and scope of their employment as LAPD officers.

COMPLAINT FOR DAMAGES AND OTHER RELIEF

499.   As a result of the Individual Officers' actions, Mr. Palacios suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages, as described more fully above and below, in an amount to be proven at the time of trial in this matter.

### SEVENTEENTH CAUSE OF ACTION

**(42 U.S.C. § 1983: First and Fourteenth Amendment—Interference with Parent/Child Relationship and Violation of Right to Familial Association)**

**(By Plaintiff Claudia Ortiz Against the Individual Officers)**

500.   Plaintiff Claudia Ortiz realleges all paragraphs contained in the Introduction, General Allegations, Factual Background sections of this Complaint, and the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

501.   The Individual Officers acted under color of state law.

502.   The acts of the Individual Officers deprived Ms. Ortiz of her liberty interest protected by the First and Fourteenth Amendments in the companionship and society of her son, Mr. Palacios.  As a result of the Defendants' misconduct, Lombardo Palacios suffered loss of liberty for seventeen-and-a-half years, thereby depriving Claudia Ortiz of the care, comfort, consortium, love, and emotional and financial support from her son during and after the period of time while he was wrongfully imprisoned.

503.   At the time of their misconduct, the Individual Officers knew or should have known that Claudia Ortiz had a constitutionally protected liberty interest under the First and Fourteenth Amendment in the companionship, society, and comfort between herself and her son, Lombardo Palacios.

504.   The Individual Officers acted with a purpose to harm Ms. Ortiz and Mr. Palacios with deliberate indifference to their rights.

505.   The Individual Officers' misconduct was undertaken pursuant to the City of Los Angeles' policies, which are more fully described above and below.

506.   The Individual Officers' conduct was an actual cause of Ms. Ortiz's injuries. As a result of the Defendants' misconduct, Claudia Ortiz has suffered great mental anguish,

emotional pain and suffering, and other grievous and continuing injuries and damages as described more fully above and below, in an amount subject to proof at the time of trial in this matter.

## EIGHTEENTH CAUSE OF ACTION

### (Indemnification)

### (By Plaintiffs Lombardo Palacios and Claudia Ortiz Against Defendant City of Los Angeles)

507.   Mr. Palacios and Ms. Ortiz reallege all paragraphs contained in the Introduction, General Allegations, Factual Background sections of this Complaint, and the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

508.   At all relevant times, the Individual Officers were employees of the Los Angeles Police Department who acted within the scope of their employment in committing the misconduct described herein.

509.   The City of Los Angeles is responsible for the actions, omissions, policies, procedures, practices, and customs of its various agents and agencies, including the LAPD and its agents and employees.

510.   California law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

511.   Pursuant to California Government Code § 815.2, the City of Los Angeles is vicariously liable to Mr. Palacios and Ms. Ortiz for all of the following causes of action by virtue of the fact that the Individual Officers, acting within the scope of their employment, are liable.  Mr. Palacios and Ms. Ortiz suffered the injuries described herein as a direct and proximate result of the Individual Officers' misconduct.  During all relevant times, the Individual Officers were employees and agents of the City of Los Angeles and the LAPD, acting within the scope of their employment or agency.

512.   Therefore, Defendant City of Los Angeles is liable as principal for all torts

committed by its agents, including the Individual Officers.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Lombardo Palacios and Claudia Ortiz respectfully request relief against Defendants, according to proof, as follows:

1. That the Court award compensatory damages, jointly and severally, in an amount to be determined at trial, but believed to be in excess of $250,000,000.00 for each plaintiff;

2. That the Court award special damages in an amount according to proof;

3. That the Court award emotional distress damages in an amount according to proof;

4. That the Court award exemplary and punitive damages against Defendants, except for the City of Los Angeles, in an amount according to proof;

5. That the Court award pre-judgment and post-judgment interest and recovery of costs of suit and reasonable attorneys' fees, including under 42 U.S.C. §1988 and Cal Civ. Code § 52.1;

6. That the Court award all other remedies authorized by Cal. Civ. Code § 52.1; and;

7. That the Court award such other relief as may be warranted or as is just and proper, including but not limited to injunctive or other non-monetary equitable relief.

///
///
///
///
///
///
///
///
///

COMPLAINT FOR DAMAGES AND OTHER RELIEF

## JURY DEMAND

Pursuant to the Seventh Amendment of the United States Constitution and Federal Rule of Civil Procedure 38(b), Plaintiffs Lombardo Palacios and Claudia Ortiz hereby demand a trial by jury on all issues so triable in this complaint.

Respectfully submitted,

Dated:  October 28, 2025          **McKENZIE SCOTT PC**

By:  */s/ Timothy A. Scott*[3]
    Timothy A. Scott
    Nicolas O. Jimenez
    Attorneys for Plaintiffs
    Lombardo Palacios and Claudia Ortiz

Dated:  October 28, 2025          **LAW OFFICES OF MATTHEW J. LOMBARD**

By:  */s/ Matthew J. Lombard*
    Matthew J. Lombard
    Attorneys for Plaintiffs
    Lombardo Palacios and Claudia Ortiz

Dated:  October 28, 2025          **NICOLAS W. TOMAS**

By:  */s/ Nicolas W. Tomas*
    Nicolas W. Tomas
    Attorneys for Plaintiffs
    Lombardo Palacios and Claudia Ortiz

---

[3] Pursuant to Local Rule 5-4.3.4(a)(2)(i), I attest that all other signatories listed, and on whose behalf this filing is submitted, concur in this filing's contents and have authorized this filing.

COMPLAINT FOR DAMAGES AND OTHER RELIEF